UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| LINWOOD HALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:11-cv-00161-JAW |
| | ) | |
| MID-STATE MACHINE PRODUCTS, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PRECISION PARTNERS HOLDING | ) | |
| COMPANY | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

After Mid-State Machine Products learned that one of its employees under the Plaintiff's supervision had been subjected to approximately one year of lewd, dirty, vulgar, and inappropriate comments from two other employees under the Plaintiff's supervision, Mid-State fired the Plaintiff. Replaced by a younger worker, the Plaintiff contends he was fired because of his age and has filed suit to prove it. In response, the employer has moved for summary judgment, arguing that the Plaintiff has failed to generate a genuine issue of material fact as to whether the Plaintiff's age was the but-for cause for his termination. Acknowledging the absence of any direct evidence of age discrimination, the Plaintiff has pressed the fact that the employer settled another age discrimination case and has attacked the employer's investigation leading to his discharge. The Court concludes that

evidence of the other lawsuit would be inadmissible and, even if admissible, would not generate a genuine issue of material fact regarding the Defendants' discriminatory animus toward the Plaintiff. The Court further concludes that the Defendants' investigation does not reveal evidence of age discrimination. The Court grants the employer's motion for summary judgment and remands the Maine Whistleblowers' Protection Act claim to state court.

## I.    STATEMENT OF FACTS

### A.    Procedural History

On March 28, 2011, Linwood Hall filed a complaint in the Kennebec County Superior Court against Mid-State Machine Products and Precision Partners Holding Company, alleging that the Defendants had engaged in age discrimination and had violated the Maine Whistleblowers' Protection Act. *Notice of Removal* Attach. 1 *Compl.* (ECF No. 1). On April 14, 2011, the Defendants removed the case to this Court. *Notice of Removal* at 1–2 (ECF No. 1). On April 26, 2011, the Defendants answered the Complaint. *Answer* (ECF No. 5). On December 6, 2011, the Defendants moved for summary judgment supported by a statement of material facts. *Defs.' Mot. for Summ. J.* (ECF No. 21) (*Defs.' Mot.*); *Defs.' Statement of Material Facts* (ECF No. 22) (DSMF). On December 23, 2011, Mr. Hall responded to the motion and to the statement of material facts, and proffered additional material facts. *Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J.* (ECF No. 25) (*Pl.'s Opp'n*); *Pl.'s Opposing Statement of Material Facts and Additional Facts* (ECF No. 26) (PRDSMF; PSAMF). On January 13, 2012, the Defendants replied to Mr. Hall's

memorandum and his statement of additional material facts. *Defs.' Reply Mem. in Support of Their Mot. for Summ. J.* (ECF No. 30) (*Defs.' Reply*); *Defs.' Resp. to Pl.'s Additional Facts* (ECF No. 31) (DRPSAMF).  The Court held oral argument on August 23, 2012.

### B.    The Facts

#### 1.    Linwood "Jake" Hall and the Defendants

Linwood "Jake" Hall worked for Defendants from February 23, 1989 until April 6, 2009.  DSMF ¶ 7; PRDSMF ¶ 7.   In 2007, the Defendants promoted Mr. Hall to Finishing Room Supervisor and he served in that position for the remainder of his employment.  DSMF ¶ 7; PRDSMF ¶ 7.  The Defendants terminated Mr. Hall on April 6, 2009.[1]  PSAMF ¶ 75; DRPSAMF ¶ 75.  Mr. Hall was 54 years old at the time of his termination.  PSAMF ¶ 81; DRPSAMF ¶ 81; DSMF ¶ 8; PRDSMF ¶ 8.

In 2009, Mr. Hall supervised about 20 people including blue collar employees Randy McGahey, Evans Lister, and Levi Mosher.  PSAMF ¶ 9; DRPSAMF ¶ 9.  Mr. Hall's job duties included supervising shipping/receiving, packaging, trucking, building inspection, shop sanitation, saw operations, deburring, waste coolants, fork truck drivers, and janitors.[2]  PSAMF ¶ 10; DRPSAMF ¶ 10.  Mr. Hall's personnel file is comprised of nearly twenty years of laudatory reviews, raises, and

---

[1]    The Defendants interposed a qualified response.  DRPSAMF ¶ 75.  However, their qualified response does not contradict this part of the Plaintiff's statement.

[2]    The Defendants interposed a qualified response, acknowledging that Mr. Hall's job duties included the duties as listed but adding other duties.  As the Plaintiff has not had an opportunity to respond to these additional facts and the Court is required to view the facts in the light most favorable to the non-movant, the Court has not included them.

promotions.[3]  PSAMF ¶ 11; DRPSAMF ¶ 11.  In the six months before Mr. Hall was terminated, the Defendants gave him two raises, including a merit-based raise in October 2008.  PSAMF ¶ 12; DRPSAMF ¶ 12.  Randy McGahey considers Mr. Hall to have been the best supervisor he ever had.[4]  PSAMF ¶ 13; DRPSAMF ¶ 13.

### 2.    The Defendants

Located at 83 Verti Drive, Winslow, Maine, Mid-State Machine Products (Mid-State) is a Maine-based company that manufactures precision machine and fabricated metal parts.  DSMF ¶¶ 1–2; PRDSMF ¶¶ 1–2.  Mid-State has 233 employees and has been in business since 1968.  DSMF ¶ 3; PRDSMF ¶ 3; PSAMF ¶ 15; DRPSAMF ¶ 15.  With headquarters located in Skokie, Illinois, Precision Partners Holding Company (Precision) is a global manufacturing and engineering services company.  DSMF ¶ 4; PRDSMF ¶ 4.

### 3.    Mid-State and Precision

---

[3]     The Defendants interposed a qualified response, stating that the Plaintiff's personnel file contains numerous documents, performance reviews, employee warnings, payroll status changes, and training documents, that the Plaintiff generally received average to good performance ratings, that the Plaintiff received a yearly wage increase offered to most Mid-State employees, and that the Plaintiff was promoted to Finishing Department Supervisor in 2007, his first supervisory position at Mid-State.  DRPSAMF ¶ 11.  As the Plaintiff has not had an opportunity to respond to these additional facts and as the Court is required to view the facts in the light most favorable to the non-movant, the Court has not included them.

[4]     The Defendants interposed a qualified response, stating that Mr. McGahey made this statement after telling Peter McAllister, the Human Resource Manager at Mid-State, about the inappropriate, derogatory, and sexual comments Messrs. Lister and Mosher had directed at him, which Mr. Hall had witnessed and failed to timely address.  DRPSAMF ¶ 13.  Further, the Defendants note that Mr. McGahey's statement was made in the context of his belief that his co-workers, including the Plaintiff, would look down on him as being a tattletale for coming forward and in the context of his desire not to get anyone in trouble.  DRPSAMF ¶ 13.  As the Defendants effectively admit the substance of Plaintiff's statement number 13, as the Plaintiff has not had an opportunity to respond to these additional facts, and as the Court is required to view the facts in the light most favorable to the non-movant, the Court has not included these additional facts.

In 1998, Precision acquired Mid-State through a stock purchase, becoming Mid-State's parent corporation. DSMF ¶ 5; PRDSMF ¶ 5. Precision has adopted Mid-State's corporate structure into its organization: the President/Chief Executive Officer of Mid-State reports directly to the President/Chief Executive Officer of Precision.[5] PSAMF ¶ 2; DRPSAMF ¶ 2. Mid-State has adopted Precision's Code of Conduct into its business operations and provided it to all employees, including Mr. Hall.[6] PSAMF ¶ 3; DRPSAMF ¶ 3; DSMF ¶¶ 12–13; PRDSMF ¶¶ 12–13. Precision's Code of Conduct addresses a policy on harassment, enforcement, and reporting, and includes statements that harassment and mistreatment of co-workers is not tolerated.[7] PSAMF ¶ 4; DRPSAMF ¶ 4; DSMF ¶ 13; PRDSMF ¶ 13. Precision supervised the implementation of this Code at Mid-State.[8] PSAMF ¶ 5;

---

[5]    The Defendants interposed a qualified response, agreeing that Mid-State's President/CEO reports to Precision's President/CEO but observing that Precision is the holding company for several different businesses, each of which maintains its own separate organizational structure. DRPSAMF ¶ 2. The Court is not sure why the Defendants' response is qualified. In any event, the Court accepts the Plaintiff's statement as it is required to view the record in the light most favorable to the non-movant.

[6]    The Defendants interposed a qualified response. DRPSAMF ¶ 3. In reviewing the qualified response, it does not appear to contradict the Plaintiff's statement and the Court has included the Plaintiff's statement as presented.

[7]    The Defendants denied paragraph 4 of the Plaintiff's statement. DRPSAMF ¶ 4. First, in reviewing the statement and the denial, it appears that the Defendants were denying only a portion of paragraph 4, not the entire paragraph. Accordingly, the Court has included the remainder of the paragraph, which the Defendant has admitted. *See* DSMF ¶ 13. However, in the introductory clause of the statement, Mr. Hall asserts that the Defendants intended Mid-State to follow this guide "to the letter." PSAMF ¶ 4. The Court reviewed the supporting citations and agrees with Mid-State that the citations do not support the Plaintiff's contention that the Defendants intended the Code of Conduct to be followed "to the letter" and the Court has thus not included this portion of the statement.

[8]    The Defendants interposed a qualified response. DRPSAMF ¶ 5. The Defendants say that it is unclear what the Plaintiff means by "supervise the implementation of the code at Mid-State." *Id.* In support of this statement, the Plaintiff cites page thirty of the deposition of Alan D. Dorval, currently the President and Chief Executive Officer of Mid-State. PSAMF ¶ 5. During the cited testimony, Mr. Hall's attorney reads from the Precision Code of Conduct, when he asks Mr. Dorval:

DRPSAMF ¶ 5.  Mid-State also provided Mr. Hall and other employees with its own sexual harassment notification and misconduct policy.  PSAMF ¶ 6; DRPSAMF ¶ 6. Mid-State operates its own facility, but Precision issues the paychecks.[9]  PSAMF ¶ 7; DRPSAMF ¶ 7.  Mid-State and Precision do not share facilities, common day-to-day management, or human resource functions.  DSMF ¶ 6; PRDSMF ¶ 6.  Except as described in the preceding paragraph, Precision does not have oversight of the day-to-day operations at Mid-State.[10]  DSMF ¶ 6; PRDSMF ¶ 6.

###    4.    Randall McGahey

Randall McGahey has worked in Mid-State's finishing department since 2007 and has a mental disability.  DSMF ¶ 23; PRDSMF ¶ 23.  Mr. Hall was Mr. McGahey's supervisor and was aware of his disability.  DSMF ¶ 24; PRDSMF ¶ 24. Specifically, Mr. Hall understood from Mr. McGahey that he had a limited learning disability from his younger years that made it difficult for him to learn things that

---

Okay.    And then it also says Precision Company counsel will supervise implementation of the code reporting directly to Precision Partners' board of directors.

Mr. Dorval confirms that this language comes from the Precision Code of Conduct itself.  DSMF Attach. 1, *Dep. of Alan D. Dorval*, at 30:2–7 (*Dorval Dep.*).  Next, counsel discusses with Mr. Dorval how Precision's counsel supervises implementation of the Code.  *Id.* at 30:8–32:11.  In light of Mr. Dorval's testimony, the Court refuses to accept the Defendants' qualified response.  To the extent the language is unclear, it is the Defendants' own language.

[9]      The Defendants admitted that Mid-State operates its own facility but denied that Precision issued payroll checks on the ground that Mr. Hall did not testify that Precision issued the payroll checks but that he believed Precision did so.  DRPSAMF ¶ 7.  The Court refuses to credit Precision's denial.  Viewing the record in the light most favorable to the Plaintiff, Mr. Hall's belief about who paid him is sufficient to support the assertion that Precision did so.

[10]      The Plaintiff interposed a qualified response to the Defendants' general statement that Precision has no oversight over the day-to-day operations at Mid-State.  PRDSMF ¶ 6.  The Plaintiff referred to his statement of additional material facts paragraphs one through seven, the contents of which have been set forth in the preceding paragraph.  Viewing the facts in the light most favorable to the non-movant, the Court has qualified the Defendants' general statement.

were too technical.  PSAMF ¶ 18; DRPSAMF ¶ 18.  Describing this learning disability, Mid-State wrote:

> [A]ny claimed issue of a Learning Disability is not something that is observable to any individual and thus, an objective observer cannot consider you to have such an issue.  Unless you had mentioned it we would not otherwise have known.[11]

PSAMF ¶ 19; DRPSAMF ¶ 19.

### 5.   Mid-State's Anti-Harassment Policy and Linwood Hall

Mid-State maintained a written anti-harassment policy, which Precision oversaw.[12]  DSMF ¶ 9; PRDSMF ¶ 9.  All employees are required to familiarize themselves with Mid-State's anti-harassment policy, and if an employee believes the policy has been violated he or she can report the suspected violation to a supervisor or to Human Resources.  DSMF ¶ 9; PRDSMF ¶ 9.  Although Mid-State often used a graduated discipline policy, an employee found to have violated Mid-State's anti-harassment policy would have been subject to discipline up to immediate discharge.[13]  DSMF ¶ 10; PRDSMF ¶ 10.  Mid-State also maintains a written misconduct policy that prohibits employees from using threatening or

---

[11]    The Defendants interposed a qualified response, stating that Mr. Hall was aware that Mr. McGahey had a mental disability and that harassing or picking on someone who has a disability constitutes inappropriate workplace conduct.  DRPSAMF ¶ 19.  They further note that the letter which the Plaintiff quoted is on Mid-State—not Precision—stationery, and that there is no indication that Precision was involved.  DRPSAMF ¶ 19.  As it is clear that Mid-State wrote the quoted statement, the Court rejects the Defendants' qualified response, though the Court has amended the statement to reflect that the statement came from Mid-State, not Precision.

[12]    The Plaintiff interposed a qualified response to the Defendants' original paragraph 9 on the ground that Precision oversaw Mid-State's policy.  PRDSMF ¶ 9.  In compliance with its obligation to view the facts in the light most favorable to the non-movant, the Court has amended the statement to reflect Precision's role.

[13]    The Plaintiff interposed a qualified response to the Defendants' original paragraph 10 on the ground that Mid-State had often used graduated discipline.  PRDSMF ¶ 10.  In compliance with its obligation to view the facts in the light most favorable to the non-movant, the Court has amended the statement to reflect Mid-State's use of graduated discipline.

intimidating language against a co-worker.  DSMF ¶ 11; PRDSMF ¶ 11.  An employee found to have violated this policy is subject to discipline up to immediate discharge.  DSMF ¶ 11; PRDSMF ¶ 11.

Beginning in 1995, Allan Dorval, the President and Chief Executive Officer of Mid-State, annually addressed all the employees and emphasized Mid-State's expectation and requirement that all employees treat each other with respect.  DSMF ¶ 14; PRDSMF ¶ 14.  Mid-State expects supervisors, including Mr. Hall, to address and prevent workplace misconduct, including workplace harassment, as part of their job duties.  DSMF ¶ 15; PRDSMF ¶ 15.

Mr. Hall received copies of Mid-State's anti-harassment and misconduct policies, and received annual training on the meaning of these policies.  DSMF ¶ 16; PRDSMF ¶ 16.  Mr. Hall knew that violating Mid-State's anti-harassment or misconduct policy could result in discipline up to immediate discharge.  DSMF ¶ 16; PRDSMF ¶ 16.  Mr. Hall understood that as a supervisor his job duties extended beyond ensuring that the Finishing Department ran smoothly, and included monitoring employee conduct and enforcing company policy, specifically Mid-State's anti-harassment and Code of Conduct policies.  DSMF ¶ 17; PRDSMF ¶ 17.  Mr. Hall understood that his job duties required him to address and stop inappropriate conduct.  DSMF ¶ 17; PRDSMF ¶ 17.  Mr. Hall further understood that he was responsible for setting a positive example for his subordinates and it was his responsibility to make sure his subordinates treated each other with respect.  DSMF ¶ 18; PRDSMF ¶ 18.  Mr. Hall understood that his job duties required him to

report inappropriate workplace misconduct, including harassment or other threatening behavior, to his supervisor and other company officials. DSMF ¶ 19; PRDSMF ¶ 19. Mr. Hall understood that sexual jokes meeting Mid-State's definition of sexual harassment were inappropriate for the workplace.[14] DSMF ¶ 20; PRDSMF ¶ 20. Mr. Hall understood that harassing or picking on someone who has a disability, on the basis of that disability, constitutes inappropriate workplace harassment.[15] DSMF ¶ 21; PRDSMF ¶ 21. Mr. Hall understood that if employees engaged in disrespectful behavior that rose to the level of harassment, he was required to stop such conduct and, if necessary, discipline the employee or recommend he or she be disciplined.[16] DSMF ¶ 22; PRDSMF ¶ 22.

### 6.  The Defendants' Climate of Acceptable Banter

Peter McAllister has served as the Human Resource Manager at Mid-State since 2007.[17] PSAMF ¶ 14; DRPSAMF ¶ 14. An age discrimination case was brought against Mid-State in 2009. PSAMF ¶ 17; DRPSAMF ¶ 17.

---

[14]   The Defendants' paragraph 20 contained the blanket statement that sexual jokes were inappropriate. DSMF ¶ 20. Mr. Hall denied the statement on the ground that only sexual jokes that met Mid-State's definition of harassment were inappropriate. PRDSMF ¶ 20. The Court has amended Defendants' paragraph 20 to clarify that Mr. Hall understood that sexual jokes meeting Mid-State's definition of harassment were inappropriate for the workplace.

[15]   The Defendants' paragraph 21 contained the blanket statement that picking on or harassing someone who has a disability would constitute inappropriate workplace harassment. DSMF ¶ 21. Mr. Hall admits that doing so because of the person's disability would constitute a violation. PRDSMF ¶ 21. In compliance with its obligation to view the facts in the light most favorable to the non-movant, the Court has incorporated the Plaintiff's qualification.

[16]   The Defendants' paragraph 22 contained the blanket assertion that disrespectful action by one employee against another required supervisory action. DSMF ¶ 22. The Plaintiff interposed a qualified response, noting that this is true only for disrespectful actions that rise to the level of harassment. PRDSMF ¶ 22. The Court amended the Defendants' statement accordingly.

[17]   In his statement of additional material facts paragraph 16, Mr. Hall asserts that there had never been any claims of sexual harassment before Mr. Hall reported one in 2009. PSAMF ¶ 16. The Defendants denied this statement on the ground that the record citation did not support the assertions. DRPSAMF ¶ 16. The Court reviewed the Plaintiff's record citation, which is portions of

Since 2006, while on breaks, Randy McGahey, Evans Lister, Levi Mosher, and other young men in the Finishing Department would from time to time joke and tease each other around the workplace.[18]  PSAMF ¶ 20; DRPSAMF ¶ 20; DSMF ¶ 25; PRDSMF ¶ 25.  Before March 23, 2009, Mr. Hall would occasionally observe these young men mutually joke back and forth.[19]  PSAMF ¶ 21; DRPSAMF ¶ 21.  From Mr. Hall's perspective, although the jokes sometimes had sexual connotations, the conversations were consensual and no one felt harassed by them.[20]  PSAMF ¶ 25; DRPSAMF ¶ 25.  Mr. Hall never saw the guys ganging up on anyone or noticed that Mr. McGahey held his head down looking uncomfortable.[21]  PSAMF ¶¶ 22–23;

---

the deposition of Peter McAllister, and agrees with the Defendants that the record citation does not support the assertions in the paragraph.  The Court has excluded the paragraph.

[18]    The Defendants interposed a qualified response, stating that although finishing department employees gathered during breaks and teased each other, and although some of the comments were innocent and of a joking nature, many comments, especially from Messrs. Lister and Mosher, were sexual, abusive, and inappropriate for the workplace.  DRPSAMF ¶ 20.  The Court views the Defendants' qualified response as non-responsive and as argument and refuses to accept it.

[19]    The Defendants interposed a qualified response, stating that Mr. Hall was present when Messrs. Lister and Mosher made the inappropriate sexual comments to Mr. McGahey.  DRPSAMF ¶ 21.  The Court views the Defendants' qualified response as non-responsive and as argument and refuses to accept it.

[20]    The Plaintiff's original statement was that Mr. Hall "saw that jokes sometimes had sexual connotations, but the conversations were consensual and nobody felt harassed during them."  PSAMF ¶ 25.  The Defendants denied the statement, citing evidence that Mr. McGahey in particular was upset by the comments and arguing that it is irrelevant whether the discussions were consensual.  DRPSAMF ¶ 25.  The Court amended the statement to clarify that it describes Mr. Hall's perspective.

[21]    The Court notes that the Plaintiff's citation is inaccurate, since the citation was "*id.*" and the preceding citation was to Mr. Lister's deposition.  *See* PSAMF ¶¶ 20–23.  However, the Court found what appear to be the intended passages in Mr. Hall's deposition.  *See* DSMF Attach. 2, *Tr. of Dep. of Linwood E. Hall*, 42:17–43:2, 71:23–72:7 (*Hall Dep.*).  Regarding the statement about never seeing the guys ganging up on anyone, the Court questions whether the record supports the statement but as the Defendants have not objected on that basis, the Court has accepted the statement.  Similarly, the Court observes that, regarding head hanging, Mr. Hall actually testified that he had never seen Mr. McGahey hang his head but if he had noticed anything in particular, Mr. Hall would have approached Mr. McGahey, pulled him aside, and asked what is going on.  *See Hall Dep.* at 72:6–9.  Again, as the Defendants did not object on the basis of inadequate record support, the Court has accepted the Plaintiff's statement.  The Defendants denied these statements, pointing to contradictory information in the McGahey and McAllister affidavits.  DRPSAMF ¶¶ 22–23 (citing DSMF Attach. 12, *Aff. of Randall McGahey*, ¶¶ 5–6; DSMF Attach. 4, *Aff. of Peter McAllister*, ¶ 18).

DRPSAMF ¶¶ 22–23.  Mr. McGahey often showed the men his tattoo of two pigs having sex and before March 2009, Mr. Hall instructed Mr. McGahey to cover up his tattoo by wearing long-sleeves because it was inappropriate for the workplace.[22] PSAMF ¶¶ 24, 26; DRPSAMF ¶¶ 24, 26.

On occasion, Mr. Hall intervened when the men persisted in joking around within the earshot of others, and on those limited occasions, Mr. Hall was aware that it was possible others would overhear and take offense.[23]  PSAMF ¶¶ 27–28; DRPSAMF ¶¶ 27–28.  Mr. Lister agreed with Mr. Hall's assessment of such risks. PSAMF ¶ 29; DRPSAMF ¶ 29.  Further, Mr. Hall occasionally pulled Mr. McGahey aside and asked, "Randy, are you OK with the [teasing]?  Because you're joking with

However, the Court is required to view the facts in the light most favorable to the non-movant, and therefore accepts the Plaintiff's version over contradictory evidence.

[22]     The Defendants denied paragraph 24—addressing whether Mr. McGahey showed his tattoo to his co-workers—on the ground that the Plaintiff did not testify that Mr. McGahey would show his tattoo to his co-workers and that the Defendants deny he did so.  DRPSAMF ¶ 24.  Instead, they say that Mr. McGahey had the tattoo on his arm and that his co-workers would see it when he wore short-sleeve shirts.  DRPSAMF ¶ 24.  The Defendants also denied paragraph 26—addressing whether Mr. Hall told Mr. McGahey to cover up his tattoo before March 2009—on the ground that the inappropriate comments persisted until at least March 2009 and therefore Mr. Hall had not timely addressed or stopped the inappropriate conduct.  DRPSAMF ¶ 26.

The Court reviewed the portion of Mr. Hall's deposition that the Plaintiff cited in support of these statements.  *See Hall Dep.* at 63:1–13.  Mr. Hall testified that Mr. McGahey had the tattoo on his arm, that he always wore short-sleeved shirts and was exposing it, and that his co-workers joked with him about it and he to them.  *Id.* at 63:1–6.  Mr. Hall testified that he told Mr. McGahey to stop wearing short-sleeved shirts and to wear long-sleeve shirts because the tattoo was not appropriate for the workplace.  *Id.* at 63:6–8.  Viewing the evidence in the light most favorable to the non-movant, the Court concludes that it is a fair inference that in wearing short-sleeved shirts that revealed his tattoo to the extent that his supervisor directed him to stop wearing short-sleeves, Mr. McGahey was often showing his tattoo to his co-workers.  Furthermore, there is sufficient evidence in the record, viewing the evidence in the light most favorable to Mr. Hall, that he had in fact instructed Mr. McGahey to cover up his tattoos.  The Court refuses to accept the Defendants' denials.

[23]     The Defendants denied Plaintiff's paragraph 27, asserting that Mr. Hall admitted he witnessed some of the inappropriate comments from Messrs. Lister and Mosher but did not stop them immediately as his job required.  DRPSAMF ¶ 27.  The Court reviewed the Plaintiff's record support and concludes that the record supports paragraph 27.  *See Hall Dep.* 42:22–23; 69:20–70:21. The Court refuses to accept the Defendants' denial.

them, too." Mr. McGahey replied, "No, I'm fine. They're just joking."[24] PSAMF ¶ 30; DRPSAMF ¶ 30.

Mid-State provided its employees with a notification regarding workplace sexual harassment.[25] PSAMF ¶ 31; DRPSAMF ¶ 31. The notification defined sexual harassment in relevant part as (1) verbal conduct of a sexual nature where (2) the conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.[26] PSAMF ¶ 32; DRPSAMF ¶ 32. Mid-State trained Mr. Hall that even if a conversation involves sexual language and even if the employees have been asked to stop the conversation, so long as it is a consensual joint conversation and both parties are happy with what is going on, there is no sexual harassment.[27] PSAMF ¶ 33; DRPSAMF ¶ 33. Until Mr. McGahey spoke to Mr. Hall on March 23, 2009, Mr. Hall observed nothing to indicate that Messrs. Lister and Mosher's purpose in teasing Mr. McGahey was to interfere with his work performance or to

---

[24] The Defendants denied this statement on the ground that there is contradictory evidence and on the ground that it is irrelevant. DRPSAMF ¶ 30. The Court reviewed the Plaintiff's record support for the paragraph and concludes that the record supports paragraph 30. The Court is required to view conflicting evidence in the light most favorable to the non-movant and therefore declines to accept the Defendants' denial based on contradictory evidence. The Court views the Defendants' contention that the statement is irrelevant as argument.

[25] The Defendants interposed a qualified response, noting that only Mid-State, not Precision, provided the notification. DRPSAMF ¶ 31. The Court reviewed the cited exhibit and agrees with the Defendants that the notification came from Mid-State without reference to Precision and has amended the statement accordingly. *See* PSAMF Attach. 4, *Tr. of Dep. of Linwood E. Hall*, Ex. 4.

[26] The Defendants denied this statement, indicating that the Plaintiff was providing an incomplete definition of harassment and that the policy was Mid-State's, not Precision's. DRPSAMF ¶ 32. The Court reviewed the Mid-State policy and concludes that the Plaintiff accurately describes a portion of the policy and, to this extent, the Court refuses to accept the Defendants' denial. The Court has altered the paragraph to reflect that it is Mid-State's policy.

[27] The Defendants denied this statement, essentially arguing that an employee's consent is irrelevant and that Mr. Hall has testified that McGahey's co-workers' comments were inappropriate and disrespectful. DRPSAMF ¶ 33. The Court reviewed the cited portions of Mr. Hall's deposition and concludes that the record supports the Plaintiff's statement. The Defendants' contentions to the contrary are argument. The Court has refused to accept the Defendants' denial.

create an intimidating, hostile, or offensive working environment; moreover, Mr. Hall observed nothing to indicate that the joking in fact interfered with Mr. McGahey's work performance or that, from his perspective, it created an intimidating, hostile, or offensive working environment.[28]   PSAMF ¶¶ 34, 36; DRPSAMF ¶¶ 34, 36.   In fact, Mr. Lister testified that he never intended to hurt anyone's feelings.[29]   PSAMF ¶ 35; DRPSAMF ¶ 35.   Mr. Hall never made any comments of a sexual nature to Mr. McGahey.[30]   PSAMF ¶ 37; DRPSAMF ¶ 37.

The Defendants had instructed all its employees that, in accordance with Precision's Code of Conduct, each employee should report what he or she believes in good faith to be a violation of law or Company policy, whether accidental or deliberate, to his or her immediate supervisor.[31]   PSAMF ¶ 38; DRPSAMF ¶ 38. These instructions further state that upon learning of a credible suspected violation of law or Company policy, supervisors must immediately communicate the

[28]   The Defendants denied these statements, essentially arguing that Mr. Hall's understanding of Mid-State's definition of sexual harassment was incomplete, that an employee's consent is irrelevant, and that Mr. McGahey's co-workers' comments were inappropriate and disrespectful. DRPSAMF ¶¶ 34, 36.  The Court reviewed the portion of Mr. Hall's deposition cited by the Plaintiff and concludes that the record supports these statements.  The Defendants' contentions to the contrary are argument.  The Court has refused to accept the Defendants' denials.

[29]   The Defendants interposed a qualified response, positing other testimony that Mr. Lister gave on the same subject.  DRPSAMF ¶ 35.  As the paragraph is supported by the record citation, the Court refuses to accept the Defendants' qualified response.

[30]   The Defendants denied this paragraph, contending that Mr. Hall later testified that he did not recall having made any sexual comments to Mr. McGahey and that the Defendants have presented evidence demonstrating that he in fact made such comments and laughed when other comments were being made.  DRPSAMF ¶ 37.  As the Plaintiff's version of the statement is supported by the Plaintiff's record citation, the Court refuses to accept the Defendants' denial in view of the Court's obligation to view the evidence in the light most favorable to the non-movant.

[31]   The Defendants interposed a qualified response, essentially tracking this statement and adding that as a supervisor, Mr. Hall knew that he had a responsibility to address and stop inappropriate workplace conduct.  DRPSAMF ¶ 38.  The Court refuses to accept the Defendants' qualified response.  The difference between the Plaintiff's paragraph and the Defendants' qualification is tonal at best and the Defendants' references to Mr. Hall's supervisory responsibilities are argument.

employee's report to more senior management and to Precision's General Counsel.[32]
PSAMF ¶ 39; DRPSAMF ¶ 39.  If Mr. Hall felt at any time that he needed help with
a problem, he was supposed to go to his supervisor.  PSAMF ¶ 41; DRPSAMF ¶ 41.

### 7.     The Harassment of Randy McGahey

During break periods, two Finishing Department employees, Levi Mosher
and Evans Lister, frequently directed sexual and other inappropriate comments at
Mr. McGahey and Mr. McGahey would engage in similar conduct with them.[33]
DSMF ¶ 26; PRDSMF ¶ 26.   These comments included statements that Mr.
McGahey needed to wear knee pads to give blow jobs, that he was a child molester,
that he was a homosexual, and that he should suck Messrs. Lister's and Mosher's
dicks.[34]   DSMF ¶ 27; PRDSMF ¶ 27.   Messrs. Lister and Mosher directed

---

[32]     The Defendants interposed a qualified response, noting that Mr. Dorval had testified that
not every suspected violation is reported to upper management or to the General Counsel and that
supervisors retain discretion.  DRPSAMF ¶ 39.  As the paragraph is supported by the record citation,
the Court rejects the Defendants' qualified response as argument.
        The Defendants also claim that because Precision's Code of Conduct supports but does not
replace Mid-State's policies and practices, the Plaintiff's attempt to rely on the Code is disingenuous
and contrary to the record.  DRPSAMF ¶ 39.  The Court rejects this qualification as argument.  At
the same time, the Plaintiff's next statement concerning the involvement of Mid-State Human
Resources and the Code of Conduct is also argument and the Court has excluded it.  PSAMF ¶ 40;
DRPSAMF ¶ 40.  The Code of Conduct itself states that it supplements any subjects covered by
policies issued by Precision and its subsidiaries.  *See* PSAMF Attach. 4, *Tr. of Dep. of Linwood E.
Hall*, Ex. 10 at 4.
[33]     The Plaintiff denied this statement.  PRDSMF ¶ 26.  However, in explaining his denial, the
Plaintiff actually admits the statement: "Plaintiff agrees that some of the comments made during
the break periods were of a sexual nature and that Mosher and Lister would direct sexual and other
comments at McGahey."  PRDSMF ¶ 26.  Mr. Hall went on, however, to point out that Mr. McGahey
would similarly engage in conduct with the two men.  PRDSMF ¶ 26.  Because the Court is
required to view the facts in the light most favorable to the non-movant, the Court has added this
fact to the Defendants' paragraph.  The Court notes that Mr. Hall should have qualified, not denied
Defendants' paragraph 26.
[34]     The Plaintiff interposed a qualified response, noting that he had no first-hand knowledge of
any of these statements other than that Mr. McGahey needed to wear knee pads to give blow jobs.
PRDSMF ¶ 27.  The Court declines to accept Mr. Hall's qualified response since the Defendants'
statement does not assert that Mr. Hall knew about these statements, only that they were made.
Further, Mr. Hall need not have personal knowledge of evidence to make it admissible.

inappropriate sexual comments at Mr. McGahey for the better part of a year.[35]
DSMF ¶ 28; PRDSMF ¶ 28.  Mr. McGahey recalls that he would often sit with his
head down waiting for break periods to end, though he would tell Mr. Hall that
Messrs. Lister and Mosher were just joking.[36]   DSMF ¶ 29; PRDSMF ¶ 29.
Although Mr. Hall did not realize that the comments rose to the level of sexual
harassment, Mr. Hall was present when Messrs. Lister and Mosher made some of
the inappropriate sexual comments to Mr. McGahey.[37]  DSMF ¶ 30; PRDSMF ¶ 30.
Even though it is his view that unless and until an employee objects to such
conduct, it does not rise to sexual harassment, Mr. Hall acknowledges that some of
Messrs. Lister's and Mosher's conduct and comments were lewd, dirty, vulgar, and
inappropriate and that his job duties required him to report inappropriate

---

[35]     The Plaintiff interposed a qualified response, noting that although he agrees that Messrs.
Lister and Mosher made sexual comments, the comments did not rise to the level of sexual
harassment.  PRDSMF ¶ 28.  The Court declines to accept Mr. Hall's qualified response because it is
non-responsive and is argument.

[36]     The Plaintiff denied DSMF ¶ 29, which stated that the comments upset Mr. McGahey and
that Mr. McGahey would often sit with his head down waiting for break periods to end.  DSMF ¶ 29;
PRDSMF ¶ 29.  Although the Defendants' statement is supported by record citations to Mr.
McGahey's and Mr. McAllister's affidavits, Mr. Hall points to his own testimony to support his
denial.  The testimony reads:

> Q.  You never noticed whether or not his head was down?
> A.  No. And if I did, if I noticed anything in particular, I would pull him aside and say, "Hey,
> Randy.  What's going on?" He said, "No, they're just joking."

*Hall Dep.* 72:4–9.  Mr. Hall's testimony confirms that he may have noticed Mr. McGahey reacting
poorly to the teasing, which prompted him to approach Mr. McGahey about it.  Because the Court is
required to view the evidence in the light most favorable to the non-movant, the Court has inserted
that Mr. McGahey recalls hanging his head, but the Court declines to eliminate the sentence in its
entirety.

[37]     The Plaintiff interposed a qualified response to this paragraph.  PRDSMF ¶ 30.  However, in
his response, he admits the paragraph:  "Plaintiff was present when Lister and Mosher made sexual
comments to McGahey."  PRDSMF ¶ 30.  Mr. Hall explains that Mr. McGahey ultimately alerted
him that he wanted the teasing to stop and Mr. Hall says he did not realize the comments rose to the
level of sexual harassment.  PRDSMF ¶ 30.  The Court has included the last statement but not the
first, because the first is non-responsive.

workplace misconduct.[38]   DSMF ¶ 31; PRDSMF ¶ 31.   Mr. Hall admits that the specific comments from Messrs. Lister and Mosher to Mr. McGahey were disrespectful.  DSMF ¶ 32; PRDSMF ¶ 32.

While witnessing some of Messrs. Lister and Mosher's comments, Mr. Hall says that he pulled Mr. McGahey aside and asked him if he was okay with the comments that were being made and that Mr. McGahey informed him that he was fine with the comments and he was just joking with his coworkers.[39]   DSMF ¶ 33; PRDSMF ¶ 33.  Mr. Hall conceded in hindsight that he "should have done more" to address and stop the inappropriate behavior.[40]   DSMF ¶ 35; PRDSMF ¶ 35.  Mr. Hall was aware that Mr. McGahey had a mental disability at the time Messrs. Lister and Mosher were making inappropriate sexual comments to Mr. McGahey. DSMF ¶ 36; PRDSMF ¶ 36.

### 8.   Randy McGahey Complains and Linwood Hall Reacts

On the morning of March 23, 2009, Mr. McGahey came to Mr. Hall and asked him to put a stop to the Lister-Mosher teasing, and it was at that point that Mr.

---

[38]   The Plaintiff interposed a qualified response to this paragraph, conceding that Messrs. Lister and Mosher's comments and conduct were lewd, dirty, vulgar, and inappropriate and that his job duties required him to report inappropriate workplace misconduct, but adding that Mr. Hall did not believe the comments rose to the level of sexual harassment unless and until the employee complained.  PRDSMF ¶ 31.  In accordance with its obligation to view the facts in the light most favorable to the non-movant, the Court amended the paragraph to reflect the Plaintiff's stated understanding.

[39]   The Court has not included Defendants' paragraphs 34, 37, and 38 because Mr. Hall denied them and the Court is required to view the facts in the light most favorable to Mr. Hall.  DSMF ¶¶ 34, 37–38.

[40]   Mr. Hall denied the Defendants' paragraph 35, which states that Mr. Hall admitted that he "should have done more" to address and stop Messrs. Lister and Mosher's inappropriate behavior. DSMF ¶ 35.  However, he does not deny that he so testified.  *See Hall Dep*. 51:8–24.  Mr. Hall's denial is based on his contention that his concession is based on what he knows now, not what he knew at the time.  Accordingly, the Court amended the Defendants' paragraph 35 to reflect that his statement was retrospective.

Hall determined that their statements to Mr. McGahey were inappropriate, that they probably constituted sexual harassment, and that he needed to put a stop to them.[41]  DSMF ¶ 39; PRDSMF ¶ 39; PSAMF ¶ 42; DRPSAMF ¶ 42.  Based on Mr. McGahey's report, Mr. Hall had a good faith understanding that the teasing had risen to the level of being offensive, and constituted a violation of company policy.[42]  PSAMF ¶ 43; DRPSAMF ¶ 43.

That morning, on March 23, 2009, Mr. Hall approached his supervisor, David Mills, and informed him that Mr. McGahey was being teased and wanted it stopped.[43]  DSMF ¶ 40; PRDSMF ¶ 40; PSAMF ¶ 44; DRPSAMF ¶ 44.  When Mr. Hall met with Mr. Mills on March 23, 2009, he did not disclose any specifics about the sexual nature of the comments being directed to Mr. McGahey, and at that time, Mr. Mills was unaware that Messrs. Lister and Mosher had directed sexual

---

[41]    In Defendants' paragraph 44 and in their response to Plaintiff's paragraph 42, the Defendants state that Mr. McGahey denies going to Mr. Hall at any point because he was afraid to be seen as a tattletale.  DSMF ¶ 44; DRPSAMF ¶ 42.  The Plaintiff admits that Mr. McGahey made this denial but the Plaintiff denies the truth of Mr. McGahey's denial.  PRDSMF ¶ 44.  Even though Mr. McGahey's denial is supported by his own affidavit, the Court cannot credit it for purposes of this motion because it would contradict the other evidence that Mr. McGahey did complain to Mr. Hall and the Court is required to view the evidence in the light most favorable to Mr. Hall.  The same is true of paragraph 45 in which the Defendants assert that Mr. McGahey's fear was based on the fact that Mr. Hall had been present during the teasing and had not stopped it.  DSMF ¶ 45; PRDSMF ¶ 45.  Furthermore, Mr. Hall himself testified that Mr. McGahey came to Mr. Hall on March 23, 2009, and Mr. Hall's testimony is sufficient support for purposes of the pending motion.  PSAMF ¶ 42.

[42]    The Defendants interposed a qualified response to this paragraph, noting that Mr. Hall had testified that when he reported the inappropriate conduct, he did not believe it was illegal.  DRPSAMF ¶ 43.  The Court reviewed the Plaintiff's and the Defendants' record citations and agrees that Mr. Hall testified that he did not know whether the conduct was illegal directly after receiving Mr. McGahey's report.  The Court has excluded the Plaintiff's statement that, based on the McGahey report, Mr. Hall had a good faith understanding that the conduct was illegal.

[43]    Oddly, despite the fact that, in DSMF ¶ 40, the Defendants stated that Mr. Hall reported Mr. McGahey's complaint to his supervisor on March 23, the Defendants interposed a qualified response to Mr. Hall's assertion that he reported the complaint to his supervisor on March 23, noting that Mr. McAllister says Mr. Hall did not make the report until March 30.  DRPSAMF ¶ 44.  The Court accepts both the Defendants and the Plaintiff's statements that Mr. Hall reported the McGahey complaint to his supervisor on March 23 and Mr. Hall's assertion that the report was made on the morning of March 23.

comments to Mr. McGahey.  DSMF ¶ 41; PRDSMF ¶ 41.  Instead, Mr. Hall reported to Mr. Mills exactly what Mr. McGahey had told him: that Messrs. Lister and Mosher were teasing him and he wanted it to stop.  PSAMF ¶ 45; DRPSAMF ¶ 45. Mr. Hall also informed Mr. Mills about the consensual joking he had witnessed earlier.[44]  PSAMF ¶ 46; DRPSAMF ¶ 46.

Mr. Mills immediately instructed Mr. Hall to address Messrs. McGahey, Mosher and Lister and put a stop to the teasing.  DSMF ¶ 42; PRDSMF ¶ 42. Specifically, Mr. Mills told Mr. Hall to meet individually with Messrs. Lister, Mosher and McGahey and instruct them (1) not to speak with each other unless it was business-related, and (2) to keep their comments to a minimum.[45]  PSAMF ¶ 47; DRPSAMF ¶ 47.  On March 23, 2009, Mr. Hall approached each man individually and instructed Messrs. McGahey, Mosher and Lister not to have any non-work-related discussions with each other and Mr. Hall reported back to Mr. Mills that he had done so.  DSMF ¶ 43; PRDSMF ¶ 43; PSAMF ¶ 48; DRPSAMF ¶ 48.  Mr. Hall told Mr. McGahey that the instructions were from Mr. Mills, that Mr. McGahey could not be retaliated against for reporting that he felt harassed, and that Mr. McGahey could speak with anyone about this.[46]  PSAMF ¶¶ 49–50;

---

[44]   The Defendants interposed a qualified response, asserting that Mr. Hall did not inform Mr. Mills about the sexual nature of the comments directed at Mr. McGahey, and that Mr. McGahey denies speaking with Mr. Hall about their teasing.  DRPSAMF ¶ 46.  The Court accepts Mr. Hall's statement as set forth because it is supported by the record citation.

[45]   The Defendants interposed a qualified response, asserting that Mr. Hall did not inform Mr. Mills about the sexual nature of the comments directed at Mr. McGahey and that Mr. Mills only instructed Mr. Hall to put a stop to the teasing.  DRPSAMF ¶ 47.  The Court accepts Mr. Hall's statement as set forth because it is supported by the record citation.

[46]   Citing Mr. McGahey's affidavit, the Defendants denied these statements.  DRPSAMF ¶¶ 49– 50.  As the Plaintiff's submissions of fact are supported by the Plaintiff's own testimony, and as the

DRPSAMF ¶¶ 49–50.  Within twenty minutes of speaking with Mr. Mills about this, Mr. Hall informed Mr. Mills that he had spoken with the three men as directed.[47] PSAMF ¶ 51; DRPSAMF ¶ 51.

Mr. Hall understood from his conversation with Mr. Mills that Mr. Mills would inform management or Human Resources if further notification were necessary.[48]  PSAMF ¶ 53; DRPSAMF ¶ 53.  Furthermore, it was Mid-State policy for Mr. Mills, as Mr. Hall's immediate supervisor, to immediately communicate the harassment report to more senior management and to Precision's General Counsel.[49]  PSAMF ¶ 54; DRPSAMF ¶ 54.  Mr. Hall relied on Mr. Mills' statement that he was going to inform Defendants' upper management of the situation.[50] PSAMF ¶ 55; DRPSAMF ¶ 55.

Court is obligated to view the evidence in the light most favorable to the non-movant, the Court has included the Plaintiff's version.  *See Hall Dep.* at 78:18–79:4.

[47]     The Defendants interposed a qualified response, asserting that Mr. Hall only estimated that it took him twenty minutes to talk with all three employees.  DRPSAMF ¶ 51.  On a motion for summary judgment, the Court is obligated to view the evidence in the light most favorable to the non-movant, and therefore Mr. Hall's sworn estimate establishes the fact.  The Court rejects the Defendants' qualified response.

         In his paragraph 52, the Plaintiff seeks to introduce Mr. Lister's support for the proposition that these conversations took place.  PSAMF ¶ 52.  The Court has not included the paragraph because it merely corroborates the Plaintiff's assertion, which the Court has accepted, that the conversations took place.

[48]     The Defendants denied this statement, asserting that Mr. Mills only told Mr. Hall to put a stop to the teasing.  DRPSAMF ¶ 53.  However, the Plaintiff's statement is supported by the cited record evidence and the Court is obligated to view the evidence in the light most favorable to the Plaintiff.

[49]     The Defendants deny this statement, asserting that the "Plaintiff's insistence that Mid-State's policy was to follow Precision's Code 'to the letter' is wrong."  DRPSAMF ¶ 54.  The Court rejects this part of the Defendants' response because the Plaintiff does not state in paragraph 54 that it was company policy for Mid-State to follow Precision's Code to the letter.  The Defendants go on to state that the Plaintiff ignores Mr. Dorval's testimony that not all complaints were to be reported to Precision's General Counsel.  DRPSAMF ¶ 54.  Again, the Court observes that it is required to view the evidence in the light most favorable to the non-movant and therefore has included the Plaintiff's statement.

[50]     The Plaintiff's paragraph asserted that Mr. Hall "reasonably" relied on Mr. Mills's statement.  PSAMF ¶ 55.  Whether Mr. Hall's reliance was reasonable is ultimately a question of law, not fact, so the Court struck "reasonable."  The Defendants denied the statement and responded

Mr. Hall understood that due to the right to privacy, he should keep quiet about this matter and talk to management when they approached him.[51]  PSAMF ¶ 56; DRPSAMF ¶ 56.  Due to Mr. Hall's understanding of Defendants' privacy policy, he did not speak to Mr. Fitzmorris about the details of the McGahey situation other than to assure Mr. Fitzmorris that he had already addressed those concerns with Mr. Mills.[52]  PSAMF ¶ 60; DRPSAMF ¶ 60.

On April 1, 2009, Mr. Hall asked Mr. McGahey how things were going with his job and the guys.[53]  PSAMF ¶ 61; DRPSAMF ¶ 61.  Mr. McGahey stated that Messrs. Lister and Mosher would not talk to him except about work-related topics.  PSAMF ¶ 62; DRPSAMF ¶ 62.  Mr. Hall reminded him that they were following the Defendants' instructions.  PSAMF ¶ 63; DRPSAMF ¶ 63.  Mr. Hall reported this to Mr. Mills.  PSAMF ¶ 64; DRPSAMF ¶ 64.  Mr. Mills replied that things were going well and instructed Mr. Hall to continue as is.  PSAMF ¶ 65; DRPSAMF ¶ 65.

### 9.   Jerry Fitzmorris Intervenes

---

[50] that Mr. Mills only instructed Plaintiff to put a stop to the teasing, citing Mr. McAllister's Affidavit. DRPSAMF ¶ 55.  In compliance with its obligation to view the facts in the light most favorable to the non-movant, the Court finds that PSAMF ¶ 55 is supported by the record, and rejects the Defendants' denial.

[51] The Plaintiff's original paragraph stated that it was "due to company privacy policy" that Mr. Hall thought he should keep quiet.  PSAMF ¶ 56.  The Defendants objected, noting that the record citation did not support the assertion that the Defendants had such a privacy policy.  DRPSAMF ¶ 56.  The Court reviewed the record citation and agrees that Mr. Hall did not mention a company privacy policy.  The Court amended the statement to reflect more accurately Mr. Hall's testimony.

[52] The Defendants interposed a qualified response to this paragraph, citing Mr. Fitzmorris' recollection of the conversation.  DRPSAMF ¶ 60.  As the Court is obligated to view the evidence in the light most favorable to the non-movant, it has included Mr. Hall's version.

[53] The Defendants interposed qualified responses to paragraphs 61 through 65 on the ground that they are "not aware of exactly what communications occurred" between Plaintiff and Mr. McGahey or between Plaintiff and Mr. Mills on April 1, 2009, and therefore cannot admit or deny the substance of the conversation as asserted."  DRPSAMF ¶¶ 61–65.  This is a frivolous objection and the Court deems the paragraphs admitted.  The Defendants do not have to have personal knowledge of evidence in order to admit it.  Furthermore, the Local Rules allow a party to admit a statement for purposes of summary judgment only.  *See* D. ME. LOC. R. 56(g).

On Thursday, March 26, 2009, Jerry Fitzmorris, a welding supervisor and Mr. Hall's peer, overheard two employees discussing some of the sexual comments Messrs. Lister and Mosher had directed at Mr. McGahey; one of the overheard employees was Russ Simpson, who reported to Mr. Fitzmorris.[54]   DSMF ¶ 46; PRDSMF ¶ 46.   Mr. Fitzmorris asked Mr. Simpson what was going on in the Finishing Department and Mr. Simpson explained that Messrs. Lister and Mosher had directed harassing and sexual comments at Mr. McGahey, including statements about his sexuality, Mr. McGahey giving blow jobs, and Mr. McGahey being a child molester.   DSMF ¶ 47; PRDSMF ¶ 47.   After talking with Mr. Simpson, Mr. Fitzmorris believed the comments directed at Mr. McGahey were inappropriate, offensive, and sexually harassing.   DSMF ¶ 48; PRDSMF ¶ 48.

Mr. Fitzmorris immediately went to Mr. Hall, and without clarifying what or whom he was talking about, Mr. Fitzmorris told Mr. Hall that Mr. Hall had a problem in his Department and that Mr. Hall needed to address it right away.[55]   DSMF ¶ 49; PRDSMF ¶ 49; PSAMF ¶¶ 57–58; DRPSAMF ¶¶ 57–58.   In fact, Mr. Fitzmorris told Mr. Hall that he needed to address the problem by Monday or else

---

[54]   The Plaintiff interposed qualified responses to paragraphs 46 and 47, indicating that he believed this incident took place on Thursday, March 26, not Friday, March 27, as stated by the Defendants.   PRDSMF ¶¶ 46–47.   The Court has altered the Defendants' paragraphs to conform to the Plaintiff's recollection.

[55]   The Plaintiff denied Defendants' paragraph 50 regarding Mr. Hall's response to Mr. Fitzmorris, PRDSMF ¶ 50, and consistent with its obligation to view the evidence in the light most favorable to Mr. Hall, the Court has not included the contents of Defendants' paragraph 50.

The Defendants assert that Mr. Fitzmorris told Mr. Hall that the problem involved Messrs. Lister, Mosher, and McGahey.   DRPSAMF ¶¶ 58–59.   During his deposition, Mr. Hall denied that Mr. Fitzmorris told him who was involved, *see Hall Dep.* 152:5–17, and, as the Court is obligated to view the evidence in the light most favorable to the non-movant, it has included the Plaintiff's paragraphs.

Mr. Fitzmorris would address it, but he did not clarify.  PSAMF ¶ 59; DRPSAMF ¶ 59.

On March 28, 2009, Mr. Fitzmorris drafted an unsigned note to Mr. McAllister, and placed it under Mr. McAllister's door.  DSMF ¶ 51; PRDSMF ¶ 51. The Fitzmorris note informed Mr. McAllister in vague terms that an employee in the Finishing Department had been intimidated and harassed and stated that the author had taken steps to address the misconduct.  DSMF ¶ 52; PRDSMF ¶ 52. The note informed Mr. McAllister that he could expect to be called into a meeting with Messrs. Hall, Mills, and McGahey.  DSMF ¶ 52; PRDSMF ¶ 52.  The note told Mr. McAllister to speak with Mr. Simpson for more specifics.  DSMF ¶ 52; PRDSMF ¶ 52.  The note did not make any reference to any sexual comments directed at Mr. McGahey.  DSMF ¶ 51; PRDSMF ¶ 51.

On Monday, March 30, 2009, Mr. McAllister discovered Mr. Fitzmorris's note and because the note was vague, unsigned, and stated that he would be contacted, Mr. McAllister did not immediately initiate an investigation.  DSMF ¶ 53; PRDSMF ¶ 53.  On the same day, Mr. Simpson approached Mr. Fitzmorris and told him that the inappropriate conduct issue in the Finishing Department had been addressed. DSMF ¶ 54; PRDSMF ¶ 54.  Later that same day, Mr. Fitzmorris approached Mr. McAllister, asked him if he had received his note, and told him that the issue in the Finishing Department was being handled, and not to worry about it.  DSMF ¶ 55; PRDSMF ¶ 55.  Mr. Fitzmorris did not provide Mr. McAllister with any specifics

about the sexual comments being directed at Mr. McGahey and Mr. McAllister was unaware that such comments were so directed.  DSMF ¶ 55; PRDSMF ¶ 55.

On April 1, 2009, Mr. Fitzmorris again spoke to Mr. Hall about the issue in the Finishing Department.  DSMF ¶ 56; PRDSMF ¶ 56.  Mr. Hall informed Mr. Fitzmorris that he had instructed Messrs. Lister and Mosher to stop making inappropriate comments to Mr. McGahey and not to speak to him about anything unless it related directly to work.  DSMF ¶ 56; PRDSMF ¶ 56.  Mr. Hall also said that he had instructed Messrs. Lister and Mosher that if they made any inappropriate comments, it could cost them their jobs.  DSMF ¶ 56; PRDSMF ¶ 56.  Finally, Mr. Hall told Mr. Fitzmorris that he had told Mr. McGahey that he could not be retaliated against and he could go to Human Resources or anyone else he wanted.[56]  DSMF ¶ 56; PRDSMF ¶ 56.

Mr. Fitzmorris believed that Mr. Hall had taken the wrong approach with Mr. McGahey as it seemed retaliatory because it excluded Mr. McGahey from the rest of the Finishing Department and it made it seem that Mr. McGahey was to blame for Messrs. Lister and Mosher's comments.  DSMF ¶ 57; PRDSMF ¶ 57.  Mr. Fitzmorris thought that Mr. Hall's actions might make the situation worse.[57]  DSMF ¶ 57; PRDSMF ¶ 57.

---

[56]      In the Defendants' paragraph 56, they state that Mr. Hall told Mr. Fitzmorris that he had told Mr. McGahey that he too could lose his job if he made any inappropriate comments.  DSMF ¶ 56.  The Plaintiff generally denied Defendants' entire paragraph 56, but the Court assumes the denial only went to this last statement and it has included the remainder of DSMF ¶ 56.  As to the last statement, the Court has inserted Mr. Hall's version because the Court is required to view the evidence in the light most favorable to the non-movant.

[57]      The Plaintiff interposed a qualified response, indicating that he has "no independent knowledge of Mr. Fitzmorris' objective beliefs," but he disagrees with the underlying premise that Mr. Hall retaliated against Mr. McGahey.  PRDSMF ¶ 57.  First, the Court assumes Mr. Hall means

As a result, on April 1, 2009, Mr. Fitzmorris wrote Mr. McAllister a second handwritten note, stating his concerns that Mr. McGahey was being mistreated and that Mr. Hall might be involved in the mistreatment. DSMF ¶ 58; PRDSMF ¶ 58. The note did not refer to any sexual comments being directed at Mr. McGahey and at the time, Mr. McAllister was still unaware of the sexual nature of the comments being directed at him. DSMF ¶ 58; PRDSMF ¶ 58. On April 3, 2009, before Mr. McAllister had begun an investigation, Mr. Fitzmorris approached him and told him that all of the issues that he had raised in his April 1 letter had been addressed and that Mr. McAllister did not need to worry about it. DSMF ¶ 59; PRDSMF ¶ 59.

### 10.   Peter McAllister Investigates

Later on April 3, 2009, Jeff Farley, Mid-State's manufacturing manager, approached Mr. McAllister and asked him whether he was aware that Mr. McGahey was being called a child molester. DSMF ¶ 60; PRDSMF ¶ 60. Based on Mr. Farley's statement, Mr. McAllister understood that the issues involving Mr. McGahey might not have been properly addressed, and he immediately began an investigation. DSMF ¶ 61; PRDSMF ¶ 61. Mr. McAllister first went back to Mr. Fitzmorris to obtain more specifics about the types of comments Messrs. Lister and Mosher had directed at Mr. McGahey. DSMF ¶ 62; PRDSMF ¶ 62. Mr. Fitzmorris informed Mr. McAllister that the comments were sexual in nature and included

---

to refer to Mr. Fitzmorris' subjective, not objective beliefs. Second, the Defendants' paragraph 57 is supported by Mr. Fitzmorris' affidavit. *See* DSMF Attach. 10, *Aff. of Jerry Fitzmorris*, at ¶ 8. Mr. Hall's objection is frivolous. The Rules of Evidence do not require that a party must have personal knowledge of all of the evidence in the case in order for it to be admissible. Finally, the fact that Mr. Hall disagrees with Mr. Fitzmorris' premise—namely, that he retaliated against Mr. McGahey—does not render Mr. Fitzmorris' belief that he had done so inadmissible. The Court has included Defendants' paragraph 57.

statements about Mr. McGahey wearing knee pads to give blow jobs, that he was a child molester, that he was a homosexual, and that he should suck Messrs. Lister and Mosher's dicks.[58]   DSMF ¶ 63; PRDSMF ¶ 63.   During the meeting, Mr. McAllister asked Mr. Fitzmorris why he did not provide the specifics sooner and Mr. Fitzmorris responded by saying that he had not mentioned the sexual comments because he thought the matter could be and was being adequately handled among peer supervisors.  DSMF ¶ 64; PRDSMF ¶ 64.

Mr. McAllister spoke to Mr. McGahey on April 3, 2009 and asked him what was going on in the Finishing Department.   DSMF ¶ 65; PRDSMF ¶ 65.   Mr. McGahey told Mr. McAllister that Messrs. Lister and Mosher had made some sexual comments to him that were upsetting, specifically that he needed to wear knee pads to give blow jobs, that he was a child molester, and that he should suck their dicks.   DSMF ¶ 66; PRDSMF ¶ 66.   Mr. McGahey also informed Mr. McAllister that Mr. Hall had instructed everyone to stop making inappropriate comments and that the comments had stopped.   DSMF ¶ 66; PRDSMF ¶ 66.   Mr. McGahey told Mr. McAllister that he had been sexually abused as a teenager and was reluctant to come forward because he did not want anyone to know what had happened to him.   DSMF ¶ 67; PRDSMF ¶67.   He said that, although he had tried to engage his coworkers during the rib sessions to defend himself, he found the

---

[58]     The Plaintiff interposed a qualified response, noting that he has no first-hand knowledge of any of these statements other than that Mr. McGahey needed to wear knee pads to give blow jobs. PRDSMF ¶ 63.  The Court declines to accept Mr. Hall's qualified response since the Defendants' statement does not assert that Mr. Hall knew about these statements, only that Mr. Fitzmorris told Mr. McAllister that they were made.   Further, Mr. Hall need not have personal knowledge of evidence to make it admissible.

sexual comments made by Messrs. Lister and Mosher particularly upsetting and hurtful. DSMF ¶ 67; PRDSMF ¶ 67. He also said that he was reluctant to come forward because Mr. Hall had been present for some of the inappropriate comments and had not intervened. DSMF ¶ 67; PRDSMF ¶ 67. He told Mr. McAllister that he thought that perhaps he was being overly sensitive and that he did not want his co-workers to think he was a tattletale.[59] DSMF ¶ 67; PRDSMF ¶ 67. Toward the end of the meeting, Mr. McAllister asked Mr. Mills to join them. DSMF ¶ 68; PRDSMF ¶ 68. Mr. Mills informed them that Mr. Hall had come to him on March 30, 2009, to talk about issues involving Messrs. McGahey, Lister, and Mosher but that Mr. Hall had never mentioned anything about sexual comments and that Mr. Mills had instructed Mr. Hall to put a stop to the teasing. DSMF ¶ 68; PRDSMF ¶ 68. Following this meeting, Messrs. McAllister and Mills spoke with Mr. Simpson, who verified that Messrs. Lister and Mosher had directed sexually inappropriate and demeaning comments at Mr. McGahey, and that while these comments were being made, Mr. McGahey looked like a "beaten puppy dog."[60] DSMF ¶ 69; PRDSMF ¶ 69.

---

[59] The Plaintiff interposed a qualified response to all the statements in paragraph 67. PRDSMF ¶ 67. The Plaintiff says he has no independent knowledge to deny that Mr. McGahey made such statements and notes that Mr. McAllister's contemporaneous notes do not include some of these details. PRDSMF ¶ 67. He denies the truth of the statements. PRDSMF ¶ 67. The Court has included all of the statements in the paragraph. To be admissible, Mr. Hall need not have personal knowledge of the evidence and whether the statements appear in Mr. McAllister's notes goes to weight, not admissibility. Finally, the statements are not being received for their truth but for what Mr. McGahey told Mr. McAllister when they met on April 3, 2009.

[60] The Plaintiff interposed a qualified response to all the statements in paragraph 69. PRDSMF ¶ 69. The Plaintiff says he has no independent knowledge to deny that Mr. Simpson made such statements. PRDSMF ¶ 69. He denies the truth of the statements. PRDSMF ¶ 69. The Court has included the statements in the paragraph. Mr. Hall need not have personal knowledge of the evidence for the Court to consider it, and the statements are not being received for their truth but for what Mr. Simpson told Mr. McAllister when they met on April 3, 2009.

Mr. McAllister also apparently interviewed some other employees: Drew Bridger, Bud Bolduc, and Alan Mathieu.[61]   PSAMF ¶ 66; DRPSAMF ¶ 66. Allegedly, these workers observed the teasing of Randy McGahey.  PSAMF ¶ 67; DRPSAMF ¶ 67.  His meetings also uncovered that Dave Mills, a supervisor, and Jim Haskell had also been informed of it.[62]  PSAMF ¶ 68; DRPSAMF ¶ 68.  Despite corporate policy, none of these employees—except Mr. Fitzmorris—reported this alleged harassment to upper management, Human Resources, or the Defendants' General Counsel.[63]  PSAMF ¶ 69; DRPSAMF ¶ 69.  Mr. McAllister did not, however, meet with Mr. Hall, his supervisor, or the co-workers who did the harassing. PSAMF ¶ 70; DRPSAMF ¶ 70.  Only Russ Simpson and Drew Bridger mentioned hearing teasing of a sexual nature, and only Mr. Simpson mentioned that Mr. Hall was present during any of it.[64]   PSAMF ¶¶ 71–72; DRPSAMF ¶¶ 71–72.

---

[61]    The Defendants interposed a qualified response, noting that Mr. McAllister had interviewed additional employees.  DRPSAMF ¶ 66.  As the Court is obligated to view the evidence in the light most favorable to the non-movant, it has accepted the Plaintiff's version.

[62]    The Defendants interposed a qualified response, noting that the record does not support the statement that Jim Haskell was a supervisor.  DRPSAMF ¶ 68.  The Court reviewed the Plaintiff's citation, Exhibit 3 to Mr. McAllister's deposition, and agrees that it does not support the statement that Mr. Haskell was a supervisor.  The Court has not included that part of the statement.  The Defendants also qualified their response by observing that Mr. Mills did not know about the teasing until after Mid-State began its investigation.  DRPSAMF ¶ 68.  As the statement is not specific as to when Mr. Mills learned, the Court has included the Plaintiff's statement as originally phrased.

[63]    The Plaintiff's original paragraph did not except Mr. Fitzmorris' report and it is unclear whether the statement was intended to include Mr. Fitzmorris.  PSAMF ¶ 69.  If so, as the paragraph contradicts other evidence the Plaintiff has acknowledged regarding Mr. Fitzmorris's actions, the Court has excepted Mr. Fitzmorris.  The Defendants denied PSAMF ¶ 69, asserting that the corporate policy does not apply, that supervisors were unaware of the problem and could not have reported it, and that none of the other supervisors were implicated in the misconduct in Mid-State's investigation.  DRPSAMF ¶ 69.  As the Court is obligated to view the evidence in the light most favorable to the non-movant, the Court has included the Plaintiff's version.

[64]    The Defendants interposed a qualified response, stating that the Plaintiff himself admits that he overheard some of the inappropriate sexual comments being directed at Mr. McGahey. DRPSAMF ¶ 71.  They say that Messrs. Fitzmorris, McGahey, and Farley mentioned the sexual comments during Mr. McAllister's investigation.  DRPSAMF ¶ 71.  As the Court is obligated to view

Nevertheless, the Defendants did not speak to Mr. Hall to obtain his version of the events.  PSAMF ¶ 73; DRPSAMF ¶ 73.  Mr. Dorval stated that his practice was to allow an employee to confront the evidence against him unless there was "overwhelming evidence from multiple sources that constituted a violation that crossed the line."[65]  PSAMF ¶ 74; DRPSAMF ¶ 74.

Toward the end of the day on April 3, 2009, Messrs. McAllister and Mills met with Mid-State's Vice President of Operations, Kevin Nelson, and with Mr. Dorval, and updated them on the status of the investigation.  DSMF ¶ 70; PRDSMF ¶ 70.  Upon hearing about Messrs. Lister, Mosher, and Hall's behavior, Mr. Dorval decided to take the weekend to digest the information and make a decision regarding these men.  DSMF ¶ 71; PRDSMF ¶ 71.

On April 4, 2010, Mr. McGahey called in sick because he was afraid to work with Mr. Lister, who was also scheduled to work that day.  DSMF ¶ 72; PRDSMF ¶ 72.  On Monday, April 6, 2009, Mr. Simpson informed Mr. McAllister that Mr. McGahey had called in sick on Saturday, April 4, 2009 because he was afraid to work with Mr. Lister.  DSMF ¶ 73; PRDSMF ¶ 73.  Mr. McAllister contacted Paul Oxley, Mid-State West Plant Manager, to see if Mr. McGahey could work at the West Facility for a while.  DSMF ¶ 73; PRDSMF ¶ 73.  Mr. Oxley agreed and Mr. McGahey was able to work at the West Facility where he could avoid working with Messrs. Lister and Mosher.  DSMF ¶ 73; PRDSMF ¶ 73.

---

the evidence in the light most favorable to the non-movant, the Court has included the Plaintiff's version.

[65]     The Defendants interposed a qualified response, not denying Mr. Dorval's statement, but seeking to add facts.  DRPSAMF ¶ 74.  As the Court is obligated to view the evidence in the light most favorable to the non-movant, the Court has included the Plaintiff's version.

Mr. McAllister continued his investigation on April 6, 2009, speaking with four individuals Mr. Simpson had said were witnesses to Messrs. Lister, Mosher, and Hall's actions.  DSMF ¶ 74; PRDSMF ¶ 74.  These witnesses confirmed that Messrs. Lister and Mosher had harassed, threatened, and intimated Mr. McGahey by directing vulgar, sexual, and other demeaning comments at him. DSMF ¶ 75; PRDSMF ¶ 75.  These individuals also told Mr. McAllister that Mr. Hall had been present when Messrs. Lister and Mosher made some of their comments and that Mr. Hall had failed to immediately put a stop to the inappropriate harassment. DSMF ¶ 76; PRDSMF ¶ 76.  Finally, Mr. McAllister was told that Mr. Hall had occasionally participated in the teasing by laughing at the comments and directing his own inappropriate comments at Mr. McGahey.[66]  DSMF ¶ 76; PRDSMF ¶ 76. Mr. McAllister completed his investigation on April 6, 2009 and met with Messrs. Dorval, Mills, and Nelson to discuss the results.  DSMF ¶ 77; PRDSMF ¶ 77.

### 11.   Mr. Dorval Acts

Mr. Dorval learned from Mr. McAllister that multiple employees had confirmed that Messrs. Lister and Mosher had directed sexually inappropriate comments at Mr. McGahey, and that Mr. Hall had been present when some of the comments had been made and had failed to immediately stop the harassment or prevent future inappropriate conduct.  DSMF ¶ 78; PRDSMF ¶ 78.  Mr. Dorval also

---

[66]     The Plaintiff denied the statements in Defendants' paragraph 76 on the ground that Mr. Hall had observed Messrs. McGahey, Lister and Mosher joking with each other in a manner that may have been objectively disrespectful but never rose to the level of offending anyone, and Mr. Hall denies that he directed inappropriate comments at Mr. McGahey.  PRDSMF ¶ 76.  Despite Mr. Hall's denial, the Court has included the statements not for their truth but to describe the information Mr. McAllister was told.

learned that Mr. Hall had occasionally participated in the harassment by laughing when the comments were being made and by making some inappropriate comments himself.[67]  DSMF ¶ 78; PRDSMF ¶ 78.  Based on Mr. McAllister's investigation, Mr. Dorval decided to terminate Messrs. Lister and Mosher's employment with Mid-State for their part in directing sexually inappropriate comments at Mr. McGahey. DSMF ¶ 79; PRDSMF ¶ 79.

Regarding Mr. Hall, Mr. Dorval was aware that Mr. Hall's behavior in condoning the mistreatment of Mr. McGahey was not the first instance in which he had demonstrated poor managerial judgment.  DSMF ¶ 80; PRDSMF ¶ 80.  In late December 2008, Mr. McGahey was disciplined after he made threatening comments about using a gun inside Mid-State's facility.[68]  DSMF ¶ 80; PRDSMF ¶ 80.  Mr. Dorval terminated Mr. Hall's employment based on Mr. Hall's condoning the mistreatment of Mr. McGahey by failing to timely address it, by participating in the abusive and sexually inappropriate teasing, and by his prior act of poor managerial judgment.  DSMF ¶ 81; PRDSMF ¶ 81.  Mr. Dorval says that Mr. Hall's actions had demonstrated to him that Mr. Hall was not fit to manage and lead the Finishing

---

[67]     The Plaintiff interposed a qualified response to the statements in paragraph 78.  PRDSMF ¶ 78.  Mr. Hall says he has no independent knowledge to deny "what Dorval's investigation indicated." PRDSMF ¶ 78.  Mr. Hall denies the truth of the findings.  PRDSMF ¶ 78.  First, Mr. Hall must mean Mr. McAllister's, not Mr. Dorval's investigation.  Second, Mr. Hall need not have personal knowledge of the evidence for the Court to consider it, and the statements are being received not for their truth but for what Mr. McAllister told Mr. Dorval when they met on April 6, 2009.

[68]     The Plaintiff denied the statements in paragraphs 80, 81, and 82, denying that he had condoned the mistreatment of Mr. McGahey and that Mr. McGahey had made such threatening comments, and asserting that he had timely addressed Mr. McGahey's complaint.  PRDSMF ¶¶ 80–82.  The Court has included the statements, despite Mr. Hall's denials, not for their truth, but to explain Mr. Dorval's decision-making.

Department and that his managerial judgment was poor.  DSMF ¶ 82; PRDSMF ¶ 82.

### 12.    Mid-State Terminates Lynwood Hall

Less than two business days after first hearing of Mr. McGahey's complaints and without interviewing Messrs. Lister, Mosher, or Hall, the Defendants terminated Jake Hall on Monday morning.[69]  PSAMF ¶ 75; DRPSAMF ¶ 75.  At the time of his termination, the Defendants provided no specific reason or explanation other than Mr. Dorval's statement, "At first, I was upset.  Then, I got mad.  You're terminated."[70]  PSAMF ¶ 76; DRPSAMF ¶ 76.  The Defendants did not allow Mr. Hall an opportunity to speak back.[71]  PSAMF ¶ 77; DRPSAMF ¶ 77.  Mr. Mills reminded Mr. Dorval that Mr. Hall had reported the situation to him and had followed his instructions.[72]  PSAMF ¶ 78; DRPSAMF ¶ 78.  The next day, the Defendants stated on an internal status change form that Mr. Hall was terminated

---

[69]    The Defendants interposed a qualified response, noting that Mr. McAllister interviewed a number of other people and that he worked on the investigation over the weekend.  DRPSAMF ¶ 75. As the Defendants' response does not contradict the Plaintiff's statement and the Court is obligated to view the evidence in the light most favorable to the non-movant, the Court included the Plaintiff's version.

[70]    The Defendants interposed a qualified response, asserting that Mr. Hall knew he was being terminated because he failed to perform his duties as a supervisor.  DRPSAMF ¶ 76.  As the Defendants' response does not contradict the Plaintiff's statement and the Court is obligated to view the evidence in the light most favorable to the non-movant, the Court included the Plaintiff's version.

[71]    The Defendants deny this statement, noting that Mr. Hall did speak during the termination meeting and told the Defendants that he reported to a higher power.  DRPSAMF ¶ 77.  In his deposition, Mr. Hall first says that he was not given an opportunity to speak, *Hall Dep.* 82:17–22, and then says that in response to a comment from David Mills, he mentioned that he answers to God.  *Hall Dep.* 82:23–83:4.  As the Court is obligated to view the evidence in the light most favorable to Mr. Hall, the Court accepts the Plaintiff's version, assuming that Mr. Hall does not characterize his brief response to Mr. Mills as an opportunity to speak back regarding the underlying facts.  Moreover, his comment appears to have been made after Mr. Dorval had already terminated him.  *See Hall Dep.* 82:17–83:4.

[72]    The Defendants interposed a qualified response, positing other evidence.  DRPSAMF ¶ 78. As the Court is obligated to view the evidence in the light most favorable to the non-movant, the Court has accepted Mr. Hall's description about what Mr. Mills said at the termination meeting.

for "misconduct—creating a hostile work environment."  PSAMF ¶ 79; DRPSAMF ¶ 79.  The Defendants denied Mr. Hall COBRA benefits, alleging that he had engaged in "gross misconduct" without any explanation.[73]  PSAMF ¶ 80; DRPSAMF ¶ 80.

### 13.  Age and Mr. Hall's Termination

Mr. Hall believes that Mid-State terminated his employment partially because of his age.  DSMF ¶ 83; PRDSMF ¶ 83.  No one at Mid-State made any comments about Mr. Hall's age, including during his termination meeting and other than his termination; Mr. Hall does not contend that he was subjected to any other harassment or disparate treatment by Mid-State because of his age.  DSMF ¶ 84; PRDSMF ¶ 84.  Mr. Hall claims that Mid-State could replace him with a younger, less costly employee.[74]  DSMF ¶ 85; PRDSMF ¶ 85.

After Mr. Hall's termination, Mid-State promoted Joe Ball, who was 38, to Finishing Supervisor.  DSMF ¶ 86; PRDSMF ¶ 86; PSAMF ¶ 82; DRPSAMF ¶ 82.  Mr. Ball received the same benefits as Mr. Hall but was paid approximately $4,000 less a year, the difference between their pay being about 8% with no difference in the cost of benefits.  DSMF ¶ 86; PRDSMF ¶ 86.  Mr. Hall agrees that a $4,000 pay

---

[73]     The Plaintiff's entire statement is longer but the Court has eliminated the argumentative portion.  PSAMF ¶ 80.  The Defendants interposed a qualified response but did not address whether they denied Mr. Hall COBRA benefits, so the statement is deemed admitted.  DRPSAMF ¶ 80.

[74]     The Plaintiff interposed a qualified response to a portion of Defendants' paragraph 85, stating that his termination resulted in "big" savings to Mid-State.  PRDSMF ¶ 85.  Mr. Hall objects because he never used the quoted term, "big."  PRDSMF ¶ 85.  The Court reviewed the record citations for this portion of Defendants' paragraph 85 and agrees that they do not support the Defendants' reference to "big" savings.  The Court has not included this portion of Defendants' paragraph 85.

disparity is a small difference and that a big difference would be $20,000.[75]   DSMF ¶ 87; PRDSMF ¶ 87.

Mr. Mosher was 42 and Mr. Lister 37 when terminated.   DSMF ¶ 88; PRDSMF ¶ 88.   Mr. Fitzmorris, who was 55 in April 2009, remains employed at Mid-State.   DSMF ¶ 89; PRDSMF ¶ 89.

### 14.   The *Duckworth* Case

In 2009, a former employee of Mid-State brought an ADEA claim against Mid-State based on its statements that it discriminated based on the age of applicants when it hired a less-qualified 34-year-old instead of the 60-year-old plaintiff.[76]   PSAMF ¶ 84; DRPSAMF ¶ 84.   When that employee submitted a different application, Mid-State told him that there were no openings at that time, but then hired a 27-year-old to fill the position.   PSAMF ¶ 85; DRPSAMF ¶ 85.

## II.   THE PARTIES' POSITIONS

### A.   The Defendants' Motion

---

[75]   The Plaintiff denied Defendants' paragraph 87 on the ground that it misstated his testimony and that whether a difference is significant is a question of fact.  PRDSMF ¶ 87.  The Court reviewed the portion of Mr. Hall's deposition that the Defendants cited in support of this statement.  *See Hall Dep.* 104:15–105:6.  The Court notes that Mr. Hall was questioned about what in his view would be a small or big difference and therefore the Court has inserted small and big for significant.  The Court rejects the Plaintiff's objection that his opinion about what a small and big difference is an issue of fact and therefore inadmissible.

[76]   The Defendants denied Plaintiff's paragraphs 84 and 85.  DRPSAMF ¶¶ 84–85.  They point out that the fact Mr. Duckworth made these allegations does not necessarily make them true, and they observe that "our legal system does not assume liability or wrong-doing simply because a lawsuit has been filed."  DRPSAMF ¶¶ 84–85.  Finally, they say that Mr. Hall offers no evidence that "his employment circumstances relate in any way to those faced by the plaintiff in *Duckworth.*"  DRPSAMF ¶¶ 84–85.  The Defendants are correct that Mr. Hall has failed to link Mr. Duckworth's claim to his own.  Further, allowing Mr. Hall to present evidence of Mr. Duckworth's lawsuit could lead to a trial within a trial.  For these reasons, the Court concludes that evidence of Mr. Duckworth's lawsuit would likely be inadmissible at trial.  These issues are discussed below.  *See infra* Part III.B.3.b.i.

As Mr. Hall is proceeding under two statutes—the Age Discrimination in Employment Act (ADEA) and the Maine Whistleblower Protection Act (MWPA), the Defendants address each separately.

### 1.   The ADEA Claim

The Defendants say that Mr. Hall's ADEA claim is subject to the familiar *McDonnell Douglas*[77] burden-shifting framework.   *Defs.' Mot.* at 10.   The Defendants maintain that, in the final stage of the burden-shifting analysis, Mr. Hall must demonstrate that age was the but-for cause of the employer's adverse action.  *Id.* at 11.  The Defendants contend that Mr. Hall's concession that age was a partial, not but-for, reason for his discharge dooms his claim.  *Id.*  Next, they assert that Mr. Hall has conceded that his only evidence of age discrimination is his subjective belief that age played a role in his termination, which they argue is insufficient as a matter of law.  *Id.* at 11–12.

### 2.   The MWPA Claim

The Defendants say that MWPA claims are also subject to the *McDonnell Douglas* burden-shifting framework.  *Id.* at 13.  Noting that the MWPA prohibits an employer from taking adverse action against an employee because the employee in good faith reports what he has reasonable cause to believe is a violation of law, the Defendants point out that the employee must be reporting an unlawful employment practice and that an employee who reports such activity in conformity with his job duties does not engage in protected activity under the MWPA.  *Id.*  Here, because Mr. Hall has admitted that his job duties required him to promote a respectful

---

[77]   *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

workplace, the Defendants argue that he cannot be said to have blown the whistle by making a required report.  *Id.* at 16.  Next, the Defendants maintain that Mr. Hall is not protected under the MWPA because he was complicit in the misconduct. *Id.* at 17–19.  Finally, the Defendants argue that Mr. Hall cannot demonstrate that Mid-State's proffered reason for the termination is a pretext.  *Id.* at 19–20.

### B.   The Plaintiff's Opposition

#### 1.   The ADEA Claim

Mr. Hall's argument on the ADEA claim focuses on the third stage of the *McDonnell Douglas* framework: "discrimination vel non."  *Id.* at 17.  The only evidence of age discrimination Mr. Hall mentions in this section of his brief is "[t]he 2009 ADEA claim of Glenn Duckworth against Defendant Mid-State," which Mr. Hall contends "serves in this motion as substantive evidence of discriminatory intent."  *Id.* at 18.  Mr. Hall then challenges Mid-State's ostensible basis for firing him, stressing that although an employer may rely on its own perception that an employee engaged in misconduct, the employer must "form its perception in good faith and may not simply rely on an arbitrary investigation that ignores substantive facts."  *Id.*

#### 2.   The MWPA Claim

On the MWPA claim, Mr. Hall points out, after reviewing the shifting burdens under *McDonnell Douglas*, that the reporting of sexual harassment is a protected activity and asserts that Mr. Hall's report to Mr. Mills satisfies the protected activity element of the MWPA prima facie case.  *Pl.'s Opp'n* at 11–12.  Mr.

Hall rejects the Defendants' contention that he cannot file a MWPA claim because he was required to report sexual harassment as part of his job duties, contending that "courts have refused to allow a blanket requirement of all employees like this to extinguish the protections of the whistleblower laws." *Id.* at 12.   Mr. Hall vigorously asserts that the Defendants are "beg[ging] the Court to overlook the summary judgment standard and ignore the sea of disputed facts concerning how [Mr. Hall] was responsible for [Messrs.] Lister and Mosher's dirty jokes and what Defendants did to find out about them." *Id.* at 13.   Mr. Hall emphatically denies participating in Mr. McGahey's harassment and emphasizes that Mr. McGahey joined in with Messrs. Lister and Mosher in the teasing that was part of Mid-State's work environment.   *Id.* at 13–14.   Mr. Hall contends that the Defendants' inconsistent behavior in its investigation and discipline "raises eyebrows." *Id.* at 15.

## C.   The Defendants' Reply

In their reply, the Defendants argue that Mr. Hall is attempting to turn this case into something it is not: a sexual harassment claim. *Defs.' Reply* at 1–2.   The Defendants maintain that "[w]hether Mosher, Lister, and the Plaintiff engaged in sexual harassment is irrelevant" and "[w]hat is relevant is Mid-State's non-discriminatory decision to end Plaintiff's employment because he witnessed, condoned, and failed to timely stop Lister and Mosher from directing inappropriate, sexual, and other derogatory comments at McGahey." *Id.* at 2.   The Defendants also defend their investigation of Mr. McGahey's complaints and say that Mr. Hall

36

"cannot point to other evidence that would lead a reasonable fact finder to conclude Mid-State's proffered reason was pretextual." *Id.* at 7.

## III.   DISCUSSION

### A.   Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  For summary judgment purposes, "genuine" means that "a reasonable jury could resolve the point in favor of the nonmoving party," and a "material fact" is one whose "existence or nonexistence has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (citations omitted).

"The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case." *Phair v. New Page Corp.*, 708 F. Supp. 2d 57, 61 (D. Me. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  "In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Phair*, 708 F. Supp. 2d at 61 (citing *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004)).  However, the Court is not "required to 'accept as true or to deem as a disputed material fact, each and every unsupported, subjective, conclusory, or imaginative statement' made by a party."

*Bonefant-Igaravidez v. International Shipping Corp.*, 659 F.3d 120, 123 (1st Cir. 2011) (quoting *Torrech-Hernández v. Gen. Elec. Co.*, 519 F.3d 41, 47 (1st Cir. 2008)).

Although the Court "view[s] the evidence in the light most favorable to the nonmovant, 'as to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party.'" *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (quoting *Ralar Distribs., Inc. v. Rubbermaid, Inc.*, 4 F.3d 62, 67 (1st Cir. 1993)). "This evidence 'cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.'" *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Mack v. Great Atl. and Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989)). "'Even in employment discrimination cases where elusive concepts such as motive or intent are at issue,' summary judgment is appropriate if the non-moving party rests 'merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003) (quoting *Feliciano De La Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 5 (1st Cir. 2000)).

## B.    The ADEA Claim

The ADEA makes it unlawful for an employer "to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1).  Where, as here, the plaintiff presents no direct evidence of discrimination, the plaintiff "may

nonetheless prove [his case] by using the three stage burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas*, 411 U.S. 792 (1973)." *Velez v. Thermo King de P.R., Inc.*, 585 F.3d 441, 447 (1st Cir. 2009).

### 1.    The Prima Facie Showing

"The first stage of the *McDonnell Douglas* framework requires a plaintiff to establish a prima facie case of employment discrimination." *Velez*, 585 F.3d at 447. To make a prima facie showing, Mr. Hall must demonstrate that: "1) he was at least 40 years old at the time he was fired; 2) he was qualified for the position he had held; 3) he was fired, and 4) the employer subsequently filled the position, demonstrating a continuing need for the plaintiff's services." *Velez*, 558 F.3d at 447; *see also Cameron v. Idearc Media Corp.*, 685 F.3d 44, 48 (1st Cir. 2012).  The First Circuit has described this prima facie showing as "modest" and a "low standard." *Velez*, 558 F.3d at 447 (quoting *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 71 (1st Cir. 2004), and *Zapata-Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40, 42 (1st Cir. 2002)). The Defendants do not appear to challenge whether Mr. Hall has succeeded in meeting this modest standard for a prima facie case, and the Court assumes he has. *See Defs.' Mot.* at 11–12 (arguing, at 12, that Mr. Hall's subjective belief is not sufficient "to rebut Mid-State's legitimate non-discriminatory reason for firing Hall").

### 2.    The Defendants' Legitimate Non-Discriminatory Reason

Once the Plaintiff has met his prima facie burden, the burden of production shifts to the employer "to produce sufficient competent evidence to allow a rational

fact-finder to conclude that a legitimate non-discriminatory reason existed for the termination." *Melendez v. Autogermana, Inc.*, 622 F.3d 46, 50 (1st Cir. 2010). The employer's burden at this stage "entails only a burden of production, not a burden of persuasion; the task of proving discrimination remains the claimant's at all times." *Mesnick*, 950 F.2d at 823.

Although Mr. Hall does not expressly concede that the Defendants met their burden of production in this case, he does not argue the point in his brief, *see Pl.'s Opp'n* at 16–17, and the Court readily concludes that the Defendants did in fact meet their burden of production. Here, undisputed evidence would warrant a rational fact finder in believing that Mr. Dorval fired Mr. Hall because of Mr. Hall's role in allowing Messrs. Mosher and Lister to direct "vulgar, sexual, and other demeaning comments" at Mr. McGahey for the better part of a year. *See* DSMF ¶¶ 75–76; PRDSMF ¶¶ 75–76; PSAMF ¶¶ 75–76; DRPSAMF ¶¶ 75–76.

Mr. Hall has contended in his responses to the Defendants' Statement of Material Facts and at oral argument that these comments were "consensual," and did not amount to "sexual harassment" under Precision's Code of Conduct until Mr. McGahey complained about them to Mr. Hall.[78] This argument is neither here nor there for purposes of the ADEA. Nor does it matter whether Mr. Hall's behavior was unlawful under Title VII. The Defendants' burden at this stage is to produce evidence to allow a rational fact finder to conclude that a legitimate, non-

---

[78]     Despite the Plaintiff's protestations, these comments likely did fit within Precision's formal definition of sexual harassment, which included "verbal conduct of a sexual nature where the conduct has the purpose or effect of creating an intimidating, hostile, or offensive working environment." PSAMF ¶ 32.

discriminatory reason existed for the termination.  That reason need not be sexual harassment.   A company may fire a supervisor for allowing "vulgar, sexual, and other demeaning comments" to continue for the better part of a year, regardless of whether they met a technical or legal definition of sexual harassment.

Mr. Dorval did not provide an explicit reason when firing Mr. Hall, saying, "At first, I was upset.   Then, I got mad.   You're terminated."   PSAMF ¶ 76; DRPSAMF ¶ 76.   But the timing and context of Mr. Hall's termination, which occurred less than two business days after Mr. Dorval learned of Mr. McGahey's complaint, would allow a rational fact finder to conclude that Mr. Hall was terminated because of his failure, as a supervisor, to deal satisfactorily with Mr. McGahey's situation.  The Defendants have borne their burden of production.

### 3.   The Plaintiff's Evidence of Discrimination

Once the employer has sustained its burden of production, the burden shifts back to the Plaintiff, who, "unaided by the presumption that was previously raised in the *prima facie* case, must put forth sufficient facts for a reasonable fact finder to conclude that [the Defendants'] proffered reason for discharging him is a pretext and that the true reason behind the firing was discriminatory animus."  *Melendez*, 622 F.3d at 52.  In an ADEA claim, the Plaintiff bears "the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action."   *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 177 (2009); *see also Velez*, 585 F.3d at 446 (quoting *Gross*).  In the summary judgment context, "the ultimate question . . . is 'whether or not the plaintiff has adduced minimally sufficient evidence to permit a reasonable

41

factfinder to conclude that he was fired because of his age." *Velez*, 585 F.3d at 452 (quoting *Davila v. Corporacion de P.R. Para La Difusion Publica*, 498 F.3d 9, 16 (1st Cir. 2007)).   When an ADEA plaintiff argues pretext, "[i]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must 'elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination." *Melendez*, 622 F.3d at 52 (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 9 (1st Cir. 1990)).

### a.      Mr. Hall's Perceptions

The Defendants contend that the only basis for Mr. Hall's claim that they engaged in age discrimination is his subjective belief they did so.   *Defs.' Mot.* at 11–12.   Even on a motion for summary judgment, the Court is not required to credit a plaintiff's unsupported subjective belief that he was the victim of age discrimination.   *See Medina-Munoz*, 896 F.2d at 8 ("Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation").   If the only evidence of age discrimination in this case were Mr. Hall's own perceptions, his case would fail.

### b.      *Duckworth v. Mid-State*

Against this contention, Mr. Hall asks the Court to consider how the employer has treated "other employees of the same protected class" and to conclude that, based on evidence that the Defendants discriminated against another former employee due to age, a fact finder could reasonably conclude that they did so

against Mr. Hall too. *Pl.'s Opp'n* at 17–18. Specifically, Mr. Hall points to one other worker, Glenn Duckworth, who filed an age discrimination case against Mid-State in federal court. *Id.*; *see Duckworth v. Mid-State Mach. Prods.*, 736 F. Supp. 2d 278 (D. Me. 2010). Mr. Hall asserts that "[t]his is not the first time an older employee has demonstrated Mid-State's discriminatory practices." *Pl.'s Opp'n* at 18. He urges the Court to conclude that evidence of Mid-State's treatment of Mr. Duckworth is admissible under Federal Rule of Evidence 404(b) and generates a genuine issue of material fact as to Mid-State's reason for terminating Mr. Hall. *Id.* at 17; *see* FED. R. EVID. 404(b)(2) (providing that evidence of a wrong may be admissible to prove, among other things, plan, absence of mistake, or lack of accident).

The Defendants, in opposition, note that the Plaintiff "offers no evidence that his circumstances are in anyway [sic] related to the circumstances of" Mr. Duckworth, *Defs.' Reply* at 6, and argue that the Plaintiff's "conclusory statement" that Mr. Duckworth's claim is evidence of discriminatory intent "is insufficient to defeat summary judgment." *Id.* The Defendants also dispute the truth of the allegations in *Duckworth*, noting that "the court in *Duckworth* did not make any finding that the allegations asserted were true." DRPSAMF ¶¶ 84–85.

### i.    Admissibility

Before it considers how to weigh evidence of Mr. Duckworth's claim toward Mr. Hall's burden of demonstrating age discrimination, the Court must decide whether that evidence would be admissible at trial. *See* FED. R. CIV. P. 56(c)(2) ("A

party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence").

In *Sprint/United Mgmt. Co. v. Mendelsohn*, the Supreme Court addressed whether "evidence of discrimination by other supervisors is relevant in an individual ADEA case" and concluded that the answer "is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008). The Supreme Court observed that "Rules 401 and 403 do not make such evidence *per se* admissible or *per se* inadmissible."[79] *Id.*

Under First Circuit law, "evidence of a discriminatory 'atmosphere' may sometimes be relevant to showing the corporate state-of-mind at the time of the termination." *Cummings v. Std. Register Co.*, 265 F.3d 56, 63 (1st Cir. 2001). Furthermore, "evidence of a corporate state-of-mind or a discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or timeframe involved in the specific claim that generated a claim of discriminatory treatment." *Cummings*, 265 F.3d at 63 (quoting *Conway v. Electro Switch Corp.*, 825 F.2d 593, 597 (1st Cir. 1987)); *see also Cariglia v. Hertz Equip. Rental Corp.*, 363 F.3d 77, 85 (1st Cir. 2004). At the same time, the First Circuit has cautioned that such evidence can be "too attenuated" to justify admission,

---

[79]     Federal Rule of Evidence 401 provides that evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence . . . ." FED. R. EVID. 401. Even if relevant, evidence may be excluded by the Court under Rule 403 "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403.

*Cummings*, 265 F.3d at 63 (quoting *Conway*, 825 F.2d at 598), and that "testimony to this effect should be let in sparingly."   *Cummings*, 265 F.3d at 63.   The *Cummings* Court also noted that "decisions to admit or exclude such evidence always demand careful balancing" under Rule 403.   *Id.* at 64; *see also Koster v. TWA*, 181 F.3d 24, 33 (1st Cir. 1999) (affirming the district court's order prohibiting the plaintiff from calling six former employees because such testimony was "collateral," and "would require the court to examine the circumstances of each individual firing").

Having been the Judge who ruled on Glenn Duckworth's case against Mid-State, the Court is not convinced that the *Duckworth* case is significantly probative of age discrimination in Mr. Hall's case, even viewing the facts in *Duckworth* in the light most favorable to Mr. Hall.[80]   Although Mr. Duckworth's case survived Mid-State's motion for summary judgment, the parties settled the claim with prejudice and there was never a finding that Mid-State in fact discriminated against Mr. Duckworth on the basis of age.[81]   *Duckworth v. Mid-State Mach. Prods.*, No. 09-cv-

---

[80]      The Court is required to view the record in the light most favorable to the non-movant. Here, the non-movant submitted only the most bare-bones description of the *Duckworth* case in paragraphs 84 and 85. PSAMF ¶¶ 84–85. Based solely on the contents of those two paragraphs, the Court would not allow the admission of evidence of the *Duckworth* case. Mr. Hall states only that a former employee brought a failure to hire lawsuit against Mid-State based on two undated incidents in which Mid-State did not rehire a former employee and the former employee claimed the failure to hire was based on age discrimination. From the Court's perspective, the *Duckworth* case as outlined in paragraphs 84 and 85 would not overcome the First Circuit's admonition to admit such evidence sparingly.

The *Duckworth* case is unusual, however, in two respects: first, the disposition of the motion for summary judgment is a matter of public record, and second, this Judge was the author of that opinion. In fairness to Mr. Hall, the Court examined the published record of the *Duckworth* case to make a more complete determination as to whether it would be admissible. The Court concludes it would not.

[81]      The Court acknowledges that the fact the parties in *Duckworth* settled does not necessarily render evidence from the case inadmissible. *See, e.g., Cummings*, 265 F.3d at 61 (describing the

279-JAW, *Stip. of Dismissal* (ECF No. 69) (D. Me. Oct. 25, 2010). To the contrary, Mid-State has consistently denied any age discrimination in its failure to rehire Mr. Duckworth. *See* DRPSAMF ¶¶ 84–85.

The facts in *Duckworth* were dissimilar to and unrelated to the facts in this case. In *Duckworth*, a 60-year-old former employee, who had been terminated in 2002 for lack of work, expressed interest in re-employment. *Duckworth*, 736 F. Supp. 2d at 281. Mid-State instead hired in 2005 a 26-year-old and in 2008 a 34-year-old to Mr. Duckworth's former position. *Id.* According to Mr. Duckworth, a Mid-State manager told Mr. Duckworth they wanted someone who would be with the company for a long time. *Id.* Mr. Hall does not allege that the manager who made this comment to Mr. Duckworth participated in the decision-making process that led to Mr. Hall's termination. Mr. Hall nevertheless asserts that this stray remark suggests a "policy of discriminating based on one's age." *Pl.'s Opp'n* at 18. In the absence of any other evidence of a discriminatory policy, this one stray remark is at best marginally probative as to why Mid-State fired Mr. Hall.

Some marginal probative value, however, does not render the *Duckworth* case admissible in Mr. Hall's claim. The Court must still determine whether the probative value is "substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay,

---

testimony of a former employee who had filed an age discrimination complaint with the Equal Employment Opportunity Commission, but later settled his case). However, the evidence of the former employee in *Cummings* consisted of continuing comments by the employee's manager that the company needed to make room for "young blood" before he was replaced by a younger worker. *Id.* The admission of these comments and employment action, if acknowledged by the employer, would be relatively straightforward—nothing like the admissibility issues that would accompany the *Duckworth* failure to rehire claim, which was based largely on indirect evidence of pretext, and could, if admitted, lead to a trial within a trial.

wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. Here, admitting evidence of Mr. Duckworth's claim could lead to a trial within a trial. The Order denying Mid-State's motion for summary judgment necessarily viewed contested facts in the light most favorable to Mr. Duckworth, and Mid-State has consistently disputed many of the material facts in Mr. Duckworth's case. *Duckworth v. Mid-State Mach. Prods.*, 736 F. Supp. 2d 278, 289 (D. Me. 2010) ("Mid-State vigorously disputes much, if not all, of Mr. Duckworth's version of the hiring process in 2005 and 2008"). If Mr. Hall were to present evidence of Mr. Duckworth's claim at trial, the Defendants would be entitled to rebut that evidence with evidence of their own. The danger of a trial within a trial would be great and weighs toward excluding the evidence. *See, e.g., Ramos-Melendez v. Valdejully*, 960 F.2d 4, 6 (1st Cir. 1992) (affirming the magistrate's exclusion of testimony by other employees with pending employment discrimination suits "on the ground that for their testimony to be significant it would be necessary in effect to try their cases, as well as the plaintiff's").

Although the Court is obligated to view all admissible evidence in the light most favorable to Mr. Hall when assessing the sufficiency of his evidence, the Court is under no obligation to bend the rules of evidence to the non-movant's benefit. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997) ("[o]n a motion for summary judgment, disputed issues of fact are resolved against the moving party . . . [b]ut the question of admissibility . . . is not such an issue of fact"); *see also Bennett v. Saint-Gobain Co.*, 507 F.3d 23, 28 (1st Cir. 2007) (noting that the First Circuit reviews

decisions to admit or exclude evidence at the summary judgment stage for abuse of discretion).  The danger of a trial within a trial, coupled with the low probative value of Mr. Duckworth's claim, leads the Court to conclude that any evidence of Mr. Duckworth's claim would likely be excluded at trial and should not be considered at the summary judgment stage.

### ii.    Sufficiency

Even if the Court were to admit evidence of Mr. Duckworth's claim at trial, such evidence would not forestall summary judgment under First Circuit precedent. Though the quantum of evidence necessary to survive summary judgment "is not susceptible to formulaic quantification," *Mesnick*, 950 F.2d at 825, evidence of discriminatory acts or statements made to employees other than the plaintiff must involve more than a single unrelated, disputed incident to raise the reasonable inference of discriminatory intent required to survive summary judgment.

For instance, in *Cummings*, two other employees believed they were also victims of age discrimination.  One testified that his boss had told him that he and other employees were "too old to do the job," and that his boss's age-related comments were "like a broken record."  *Cummings*, 265 F.3d at 61.  The other testified that his boss had repeatedly told him that the company needed to make room for "young blood."  *Id.*  The case went to trial.

Likewise, in *Santiago-Ramos v. Centennial*, a sex discrimination case, the plaintiff's immediate supervisors had repeatedly made discriminatory comments. *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 55 (1st Cir. 2000).

48

The plaintiff also presented evidence that others at the company had made similar comments. *Id.* at 55–56. The First Circuit held that although the latter comments "are not proof of discrimination against [the plaintiff], they add 'color' to the decision-making process and to the reasons given for her dismissal" and, when combined with the comments by the plaintiff's supervisors, could reasonably be relied upon by a jury. *Id.* at 56.

By contrast, in *Medina-Munoz*, the plaintiff put forth two pieces of evidence to prove discriminatory intent. The first was that his supervisor had mentioned, prior to becoming the plaintiff's supervisor, "that the sales personnel was [sic] getting too old," and that this was a "problem" for the company. 896 F.2d at 9. The second piece of evidence was that the plaintiff's former supervisor often addressed him as "el viejo" (the old man). *Id.* at 10. Yet the First Circuit held that these stray comments were "fragmentary tendrils" that did not suffice, without more, to prove age discrimination. *Id.*

Similarly, in *Mesnick*, the plaintiff offered only "two isolated tidbits" to prove discriminatory intent. 950 F.2d at 826. One was a comment made by the plaintiff's boss, upon the resignation of a subordinate, that he was "sad to lose the youth of the work force." *Id.* The second piece of evidence was that a search firm listed the ages of potential recruits. *Id.* The First Circuit held that, "[v]iewed singly or in combination, these fragments would not allow a rational jury to find that GE had a hidden, age-oriented agenda." *Id.*

Here, Mr. Hall's evidence of age discrimination is even weaker than the evidence in *Medina-Munoz* or *Mesnick*, where the plaintiffs at least had personal knowledge of age-related comments.  Mr. Hall concedes that no one at Mid-State made any comments about Mr. Hall's age.  DSMF ¶ 84; PRDSMF ¶ 84.  The fact that one other employee sued Mid-State for age discrimination based on a remark made by an employee who was not involved in Mr. Hall's firing is scant proof that Mr. Hall's termination was age-related.  In the First Circuit, "the discriminatory intent of which a plaintiff complains must be traceable to the person or persons who made the decision to fire him."  *Bennett*, 507 F.3d at 31.  Moreover, other than the fact that Mr. Hall was replaced by a younger worker, no additional evidence corroborates Mr. Hall's claim: "no statistical evidence, no demonstration of discriminatory corporate policies, no instances of disparate treatment, no invidious pattern of age-related discharges or forced early retirements."  *Medina-Munoz*, 896 F.2d at 10.

The Court's obligation to view the facts in the light most favorable to Mr. Hall does not require it to make improbable inferences.  *See id.* at 8 ("summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation").  Even if it were admissible, evidence of Mr. Duckworth's claim is too remote from Mr. Hall's circumstances, and the inference of age discrimination Mr. Hall urges too far-fetched, to forestall summary judgment.

### c.    Arbitrary Investigation

The Plaintiff spends much of his brief trying "to impugn the veracity of the employer's justification."[82] *Melendez*, 622 F.3d at 52 (quoting *Mesnick*, 950 F.2d at 824); *see Pl.'s Opp'n* at 14–16, 18–19.  To survive summary judgment in an ADEA case, however, he must do something more: he must "elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination." *Melendez*, 622 F.3d at 52 (quoting *Medina-Munoz*, 896 F.2d at 9).

Mr. Hall claims that the Defendants did not provide him with any explanation for months as to its rationale for terminating him.  *Id.* at 14.  He says that "[o]nly now, after the commencement of litigation, have the Defendants come up with at least four reasons: (1) he not only condoned the harassment, but (2) he actively participated in it, (3) his job was already hanging by a thread for a 2008 statement he made, despite no written warning (or even documentation) and an intervening merit-based raise, and (4) McGahey was a vulnerable, mentally-challenged man who couldn't be joked with, even though he made dirty comments and boldly showed off a tattoo of two pigs having sex." *Id.* at 14–15.

Mr. Hall argues that the comments Messrs. Lister and Mosher directed at Mr. McGahey did not fit within the Defendants' own definition of sexual harassment.[83]  *Id.* at 15.  He complains about inconsistent discipline, noting that

---

[82]     Some of Mr. Hall's arguments along these lines are found only under the MWPA section of Mr. Hall's brief.  *See Pl.'s Opp'n* at 14–16 ("d. Defendants' interpretation of the facts is contradictory and evidence of its discriminatory intent.").  Nevertheless, the Court has also considered whether these arguments strengthen Mr. Hall's case of discrimination under the ADEA.

[83]     Although Mr. Hall makes this argument in the MWPA section of his brief, and although the Court has already discussed it under the second prong of the *McDonnell Douglas* framework, Mr. Hall seemed to contend at oral argument that this argument is also relevant to pretext under the

five other employees were aware of the harassment and failed to report it, that the Defendants failed to discipline Mr. McGahey for making sexual comments to his co-workers, and that David Mills, Mr. Hall's supervisor, failed to take action when he was notified, yet was not disciplined.  *Id.*

Mr. Hall attacks Mid-State's investigation as arbitrary, and questions Mid-State's stated rationale.  *Pl.'s Opp'n* at 18–19.  Mr. Hall points out that, although Mid-State claimed it fired Mr. Hall because he "allegedly condoned and engaged in the harassment of a 'mentally challenged man' while having a previous history of poor managerial judgment," Mr. McGahey's disability was unobservable to co-workers and supervisors.  *Id.* at 18.  Mr. Hall notes that "as soon as he realized the scope of the teasing, he intervened swiftly to first report it and then to stop it."  *Id.* at 18.  Mr. Hall observes that "subjective standards used to assess an employee's performance can be used, consciously or otherwise, to mask unlawful discrimination," *id.* (citing *Phair v. New Page Corp.*, 708 F. Supp. 2d 57, 66–67 (D. Me. 2010)), and argues that the teasing did not amount to sexual harassment under the law.[84]  *Id.*

The problem with these arguments is that "[t]he evidence was consistent on the essential point."  *Carreras v. Sajo*, 596 F.3d 25, 37 (1st Cir. 2010).  The undisputed evidence shows that, for approximately one year, employees under Mr.

---

ADEA.  The Court has therefore considered this argument under the ADEA as well.  Similarly, although Mr. Hall attacks Mid-State's "inconsistent behavior" and after-the-fact justifications in the MWPA section of his brief, the Court has also considered whether these arguments strengthen Mr. Hall's case of discrimination under the ADEA.

[84]     This argument is also discussed above under the second prong of the *McDonnell Douglas* framework.  *See supra* Part III.B.2.

Hall's supervision directed "lewd, dirty, vulgar, and inappropriate" comments at another employee under his supervision, calling the employee a child molester and a homosexual, demanding that he wear knee pads to give blow jobs, and saying he should suck their dicks.  Knowledge of this behavior was widespread within the employer and had reached not only the employees of other departments but the supervisor of another department.  Once the employer's CEO learned of the nature and extent of the harassment, the CEO quickly fired the 54-year-old supervisor, who had been aware of the behavior and failed to put a stop to it.  The company also fired the 42-year-old and 37-year-old employees who made the comments and did not fire the 55-year-old fellow supervisor who first reported the harassment to Mr. McAllister.

Even if Mr. Hall were to show that Mid-State's decision to fire him were "unfair or unwise," he would be entitled to no relief under the ADEA because he has failed to raise a reasonable inference that age discrimination was the real reason for his firing.  *See Davila v. Corporacion de Puerto Rico Para La Difusion Publica*, 498 F.3d 9, 16 (1st Cir. 2007).  In reviewing employment discrimination cases, courts do not act as "super personnel departments," substituting their judicial judgments for the business judgments of employers.  *Mesnick*, 950 F.2d at 825.  Here, it seems unarguable that the Defendants—faced with evidence of this year-long behavior— were fully within their rights in firing the employees who perpetrated it and the supervisor who failed to stop it.  *See Bennett*, 507 F.3d at 32 ("In the absence of any

evidence that an employer's decision was pretextual or motivated by discriminatory intent, a court has no right to supersede that decision").

Mr. Hall relies on a recent case from this District, *Phair v. New Page Corp.*, to show that "subjective standards used to assess an employee's performance can be used, consciously or otherwise, to mask unlawful discrimination." *Pl.'s Opp'n* at 19, citing *Phair v. New Page Corp.*, 708 F. Supp. 2d 57, 66–67 (D. Me. 2010). While that general proposition is uncontroversial, *Phair* was unlike Mr. Hall's case. In *Phair*, the plaintiff presented evidence of both "numerous references to age . . . some of which occurred during the meetings in which Plaintiff's termination was discussed" and "statistical evidence showing a correlation between age and the likelihood of termination." *Phair*, 708 F. Supp. 2d at 68. Mr. Hall has presented evidence of neither.

### d.     Summary

In short, Mr. Hall has failed to present sufficient evidence to permit a reasonable inference of discriminatory animus. Moreover, even if the Court were to admit evidence of Mr. Duckworth's claim at trial, such evidence is the type of "fragmentary tendril" that does not suffice, without more, to prove age discrimination. *See Medina-Munoz*, 896 F.2d at 10. A rational fact finder could conclude that the reason Mr. Hall was fired was his actions—or more precisely his inaction—in preventing lewd, dirty, vulgar, and inappropriate comments from poisoning the workplace he supervised. That reason may, to Mr. Hall, seem foolish, incorrect, and arbitrary. *See Davila*, 498 F.3d at 17 (noting that it is not the

54

province of the courts to second-guess business decisions regardless of whether they seem "wise or foolish, correct or incorrect, sound or arbitrary").  But a rational fact finder could not conclude, based on Mr. Hall's evidence, that age played any role in Mid-State's decision to fire him, let alone that it was the but-for cause of his termination.  *See Velez*, 585 F.3d at 448 ("[u]ltimately, the plaintiff's burden is to prove that age was the but-for cause of the employer's adverse action").

## C.   The Maine Whistleblowers' Protection Act Claim: Supplemental Jurisdiction

The sole basis for federal jurisdiction in this case is the federal question under the ADEA.  *Notice of Removal* (ECF No. 1) ("Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over this action because the Plaintiff has raised in his Complaint a federal question based upon allegations that the Defendants violated the Age Discrimination in Employment Act of 1967").  With the grant of summary judgment against the Plaintiff on the ADEA claim, what remains is solely a matter of state law: whether the Defendants violated the MWPA, 26 M.R.S. §§ 831–40.

Under 28 U.S.C. § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction over a claim [over which it had original jurisdiction] if . . . the district court has dismissed all claims over which it has original jurisdiction."  In addition, section 1367(c)(1) provides that a district court may decline to exercise supplemental jurisdiction if "the claim raises a novel or complex issue of State law."  28 U.S.C. § 1367(c)(1).  In deciding whether to assert supplemental jurisdiction over state law claims, the Court "must weigh concerns of comity, judicial economy,

convenience, and fairness." *Redondo Constr. Corp. v. Izquierdo*, 662 F.3d 42, 49 (1st Cir. 2011). "In the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

Here, although the evidentiary bases for Mr. Hall's MWPA and ADEA claims are similar, requiring the parties to litigate the state claim in state court would not be unduly costly or wasteful and would advance principles of comity. *See Redondo*, 662 F.3d at 50. Mr. Hall's MWPA claim raises a series of state law questions, including whether Mr. Hall engaged in protected activity, whether his report of the sexual harassment of Mr. McGahey was in conformity with his job duties, whether he was complicit in the misconduct, and whether his complicity, if proven, bars his MWPA claim. Under these circumstances, the Maine state courts should resolve contested issues of Maine state law.

However, rather than dismiss the state-based claims without prejudice and force Mr. Hall to begin again in state court, it is preferable to direct him back to where he began: the Kennebec County Superior Court. *See Carnegie-Mellon*, 484 U.S. at 351 ("the animating principle behind the pendent jurisdiction doctrine supports giving a district court discretion to remand when the exercise of pendent jurisdiction is inappropriate"); *see, e.g., Wainwright v. Cnty. of Oxford*, 369 F. Supp. 2d 3, 9 (D. Me. 2005) (remanding the case to state court upon dismissal of the federal count).

IV.    **CONCLUSION**

The Court GRANTS the Defendants' Motion for Summary Judgment (ECF No. 21).  The Court REMANDS the case to the Kennebec County Superior Court.

SO ORDERED.


<u>/s/ John A. Woodcock, Jr.</u>
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE


Dated this 11th day of September, 2012